JOHANNA M. HANSEN, PLAINTIFF IN ERROR, v. NORTH JERSEY STREET RAILWAY COMPANY, DEFENDANT IN ERROR.

Submitted March 27, 1900—Decided June 25, 1900.

1. A common carrier of passengers must use a high degree of care to protect them from danger that foresight can anticipate.

2. By foresight is meant not foreknowledge absolute, nor that exactly such an accident as has happened was expected or apprehended, but

rather that the characteristics of the accident are such that it can be classified among events that, without due care, are likely to occur, and that due care would prevent.

3. The crowding of a trolley car, and especially of those parts of it that are used for entrance and exit, is attended with a liability to danger that the carrier should anticipate and employ care to avert.

On error to the Supreme Court.

For the plaintiff in error, *McEwan & McEwan.*

For the defendant in error, *Vredenburgh & Garretson.*

The opinion of the court was delivered by

ADAMS, J.   The plaintiff brought suit to recover damages for a personal injury alleged to have been occasioned by the negligence of the defendant.   The trial judge directed a verdict for the defendant.   This direction was excepted to and on it error has been assigned.

It appears that at about half-past nine o'clock in the evening of Decoration Day, 1898, the plaintiff with her married daughter got on a closed car of the defendant company at Bergen Point, which was bound from Bayonne to the Jersey City ferry.   They took seats on the right-hand side of the car, near the front.   Only a few persons were then in the car. The plaintiff lived at No. 161 Palisade avenue, in the northern part of Jersey City.   Both she and her daughter received tickets entitling them to a transfer to a court-house car at a point of transfer called by the witnesses "the Junction," which is at the corner of Grand and Communipaw avenues. The car reached the Junction between ten and half-past ten o'clock.   By this time it had become crowded.   When it stopped at the Junction the plaintiff and her daughter arose from their seats and attempted to leave the car by the rear door, which was more distant from them than the front door. Some of the passengers went out at the rear door.   The motorman, in order to facilitate the exit of passengers, opened the front door and the gate on the right-hand side, and the pass-

engers who were in the forward end of the car pressed in that direction. It was the custom, for the accommodation of pass- engers, to open both doors at this place when there was a crowded car. The plaintiff and her daughter, not being able to make headway toward the rear door, to which they had at first turned, had to yield to the current that was flowing in the opposite direction and proceeded or were pushed along toward the front of the car. The conductor remained through- out on the rear platform. The motorman stood at his post on the front platform, facing toward the inside of the car and observing the passengers as they came out. After they had left the car he closed the front door and right-hand gate and awaited the signal to go ahead. The evidence on behalf of the plaintiff tended to prove that she was injured in endeavor- ing to leave the car. It is not claimed that there was any structural defect in the platform or step. The negligence imputed to the defendant is having more passengers than could safely and prudently be carried and overcrowding the car and platform.

In order to an accurate view of the case it is necessary to refer somewhat particularly to the proof. The evidence as to the accident was as follows: The plaintiff, who testified through an interpreter, said :

"We went to the Junction, and then the conductor called 'Junction,' and as we were going to make connection with the court-house car, we got up and wanted to go to the rear platform, but at once the people were so crowded that they forced us to the front platform, and from the front platform I got a push on the step, and I got such a severe push on my right shoulder that I fell from the step on the fender, and so I bruised my arm, my hand is broken in two different places, and my whole side was bruised, and my eye here, I couldn't hardly see out of this eye.

"*Q.* What do you say about people standing in the aisle of the car when you got to the Junction?

"*A.* Well, it was a great crowd, and they gave me a push, very much crowded, and so they pushed me. on the front platform.

"*Q.* Were people standing between the seats on the car?

"*A.* Certainly, it was all full, all full, and so soon as they opened the front door, we was forced to the front platform.

"*Q.* Do you know who opened the front door?

"*A.* No, I can't tell, sir; we was just on our way to go out through the rear and they forced us to the front."

On cross-examination she again said that the car was very much crowded when it reached the Junction, and that she and her daughter started to go to the rear door but were forced to go out of the front door. The cross-examination proceeded as follows:

"*Q.* If you had sat still they would not have forced you?

"*A.* If the conductor calls 'Junction' and you want to make connection I guess you have to get up; when we got up the front door was closed, and we did not know the front door would be opened.

"*Q.* Was there a crowd at the back door?

"*A.* No.

"*Q.* Why didn't you go out of the back door?

"*A.* Because they forced us to the front platform; the crowd forced us.

"*Q.* And you went out to the front platform?

"*A.* Yes.

"*Q.* And did you step on the step?

"*A.* Yes, sir.

"*Q.* Got safe on to the step?

"*A.* Yes, sir.

"*Q.* You got on the step safely?

"*A.* I was forced from the platform to the step, and from the step I received such a push on my right side that I fell just that way over the fender.

"*Q.* How could you fall over the fender from the step?

"*A.* I got pushed so hard.

"*Q.* You did not fall over the front of the dashboard, did you?

"*A.* No, sir.

"*Q.* How could you fall over the fender in the front from being pushed off the step?

"*A.* Well, but I fell on the fender.

"*Q.* But the fender is on the front?

"*A.* Yes, I know it.

"*Q.* Didn't you walk around there and tumble on the fender after you got off the car?

"*A.* No, I did not; I was on the car, and from the car I fell on the fender from the side.    *    *    *

"*Q.* Your idea was that when you got off you would go around the front of the car and get to the court-house car?

"*A.* No, I never go around the fender; I always go around the other way.    *    *    *

"*Q.* And you said when you were on the platform somebody pushed you on the step?

"*A.* Yes.

"*Q.* And gave another push, and you fell on the fender?

"*A.* Yes, on the fender.

"*Q.* What is your age?

"*A.* Sixty-eight."

Mrs. Christina Dahl, the plaintiff's daughter, testified that when the car reached the Junction it was very much crowded by passengers standing; that she and her mother, when they rose from their seats to leave the car, turned toward the rear door, but that at once the front door was opened and that they were forced out with the crowd through the front door. Her examination proceeded as follows:

"*Q.* Were you ahead or behind your mother?

"*A.* No, I was ahead, because I intended to get out first, to help my mother out.

"*Q.* Go on and tell what happened to your mother.

"*A.* I got out first, to help my mother out, but I got out fortunately, although I received a push, and my mother was pushed from the front platform to the step, and from the step she received such a severe push on her right side and shoulder that she struck the fender and caught her foot and fell right down towards the fender.

"*Q.* What part of the fender did she strike—the front or the back?

"*A.* No; more the front; she was thrown from the car; the push that she had received threw her in that direction."

A part of Mrs. Dahl's cross-examination is as follows:

"*Q.* You stepped on the step?

"*A.* Yes.

"*Q.* And stepped off safely?

"*A.* Yes, I got off fortunately.

"*Q.* Who was the next person behind you?

"*A.* My mother.

"*Q.* Right close behind?

"*A.* Yes.

"*Q.* Did you see anybody push her?

"*A.* The crowd was all pushing, but I could not say who it was; some passengers; they pushed her on the side and right shoulder.

"*Q.* Did they put their hand on her—you did not see any one push your mother, at all?

"*A.* I said the crowds were all pushing out that way; they pushed me and I got out fortunately.

"*Q.* Will you answer my question—did you see anybody push your mother?

"*A.* I did not see the hand, but I saw the crowd was all going out that way. * * *

"*Q.* And this push came on your mother?

"*A.* Upon her right side.

"*Q.* And from that push she fell on the fender?

"*A.* Yes; a severe push.

"*Q.* Can you describe how that was done—the fender was on the front of the car?

"*A.* Yes, but they gave her such a severe push, which threw her over in that direction.

"*Q.* How could she be pushed on the front?

*A.* That was how it was done."

This testimony tended to prove that the company of out-going passengers exerted considerable pressure, and that some

person or persons who stood on the front platform, behind the plaintiff, acted rudely, crowding her off the platform on to the step, and then pushing her violently from the step, so that she fell on the fender.

Several witnesses were called in defence. It was admitted that the plaintiff's injuries came from falling on the fender. The testimony for the defendant as to the occurrence of the accident was, for the most part, either not inconsistent with that of the plaintiff and her daughter or did not strongly and distinctly contradict it. William Doran, the conductor, said that he was on the rear platform while the passengers were getting out, and did not know that any one had fallen at the other end of the car. The examination of Alfred Gross, the motorman, was in part as follows :

"*Q.* And when you got to the Junction what did you do?

"*A.* I stopped the car, sir.

"*Q.* Then what happened?

"*A.* I opened the front door first, then I opened the gate.

"*Q.* The car then standing still?

"*A.* Standing perfectly still, sir.

"*Q.* And what happened?

"*A.* I turned around after opening the door; I stood facing the door.

"*Q.* You opened the gate first?

"*A.* Yes, and opened the door and stood facing the door, and the passengers got out.

"*Q.* Was there crowding going on there?

"*A.* There was a few people there, sir.

"*Q.* Well, what happened?

"*A.* After the passengers got off I closed the front door again, closed the gate and stood ready to start the car.

"*Q.* After the passengers got out you closed the front door?

"*A.* Yes.

"*Q.* Closed the gate?

"*A.* Yes.

"*Q.* And stood ready to get the signal to go ahead?

"*A.* Yes.

"*Q.* Did you know of anybody having fallen then?

"*A.* Not up to that time.

"*Q.* Had you heard anyone call out?

"*A.* No, sir.

"*Q.* Seen anybody fall?

"*A.* No, sir.

"*Q.* Had anybody fallen from the steps?

"*A.* No, sir; after getting the signal to start I saw a policeman walking across the front of the fender.

"*Q.* Across the track?

"*A.* Yes, and on the right-hand side there was standing a lady, and two gentlemen standing her up."

Louis Sale, a witness for the defendant, said that he was standing on the sidewalk at the Junction; that he saw a Bayonne car coming down the track towards Jersey City; that it stopped at the Junction, and that after it stopped he saw an old lady fall on the fender, and went over to assist her. His examination was in part as follows:

"*Q.* You did not see where she came from?

"*A.* Well, I did not know whether she was in the group of people that came off the front of the car.

"*Q.* Did you see her actually fall?

"*A.* I saw her drop on the fender.

"*Q.* From what position did she drop into the fender—from a standing position or a walking position?

"*A.* A walking position; I don't suppose she was standing.

"*Q.* You can't tell where she came from?

"*A.* Came from the car.

"*Q.* You did not see her get off?

"*A.* I seen them coming out of the door; there were ladies there, and I supposed that she was there.

"*Q.* How did it seem to you that she got to the side of the fender?

"*A.* In order to get around and get the car; in order to get around and get to the court-house car.

"Mr. McEwan—I object to that. Let him give the facts.

"*Q.* Was she pushed off the platform on to the fender?

"*A.* That I could not say; I was not close enough to see that.

"*Q.* Was she so situated at that time that she could have been pushed from the platform on to the fender?

"*A.* It might have been."

Henry Manning, a police officer, was called for the defence. He was on duty at the Junction on the evening of the accident and stood at the corner, apparently on the sidewalk. His examination was in part as follows:

"*Q.* Did the car stop?

"*A.* The car stopped, and I seen an old lady laying on the side of the fender.

"*Q.* How did she get on the fender?

"*A.* I couldn't say; she was right with her left hand laying on the side of the fender.

"*Q.* Which side?

"*A.* On the right-hand side; she got off on the right-hand side.

"*Q.* Did you see her get off?

"*A.* I seen her get off that side?

"*Q.* Did she get off safely?

"*A.* Yes, sir; then I happened to look over and I seen her laying on the fender with her left arm.

"*Q.* How did she get on the fender?

"*A.* I couldn't say that; first I seen her on the fender."

His cross-examination was in part as follows:

"*Q.* Where did you first see her?

"*A.* I seen her getting off the car on the right-hand side. *  *  *

"*Q.* She got off on the opposite side of the car from you?

"*A.* She got off on the right-hand side.

"*Q.* That was the opposite side of the car from you?

"*A.* Yes.

"*Q.* And how did she get off?

"*A.* She got off at the front of the car.

"*Q.* Well, how?

"*A.* Got off the front, down on the step.

"*Q.* Yes?

"*A.* And the first thing I seen her laying on the side of the fender.

"*Q.* That is the first you saw?

"*A.* Yes."

It was insisted for the defendant, on the argument in this court, that the evidence leads to the conclusion that the plaintiff alighted safely and then was either pushed upon the fender by some one for whose act the defendant is not shown to have been accountable, or fell on the fender while attempting to walk round in front of the car. No doubt the same argument was addressed to the trial judge in support of the motion to direct a verdict. It is enough to say that these were disputed questions of fact. It was further insisted before this court, and no doubt before the trial judge also, that the plaintiff's story is intrinsically incredible, because a trolley car is so constructed that a passenger cannot be thus pushed from the step to the fender. But the plaintiff did not say, and it is not necessary to suppose, that she was pushed from the step to the fender without touching the ground. This, also, was a disputed, or a disputable, question of fact. The trial judge did not, of course, intend to take from the jury any disputed or disputable question of fact. In directing a verdict for the defendant he must therefore have assumed, for the purposes of that ruling, that the account of the matter given by the plaintiff and her daughter was the true one. The question presented to the trial judge by the motion to direct a verdict necessarily took this form. Assuming it to be true that the plaintiff was pushed, as she says that she was, from the platform to the step, and then from the step to the fender, is it clear that the defendant is without responsibility to her? If the case was not so one-sided as to exclude a reasonable doubt in favor of the plaintiff it should have gone to the jury.

It will now be well to state the legal considerations that must govern a case like this. A common carrier is bound to

take a high degree of care of its passengers. This general duty includes a specific responsibility as to the entrances and exits provided for its vehicles. Judicial records show that these are places of some danger—a danger that is aggravated by the willingness of the American public to sacrifice comfort to time, of which disposition common carriers take advantage. *Shearm. & R. Negl.* (5th ed.) 523 ; *Meesel* v. *Lynn and Boston Railroad Co.*, 8 *Allen* 234. No opinion is expressed as to whether, in strict right, the number of passengers should be limited to the number of seats. That question has not been raised in this case. If such a right exists, most Americans waive it. Practically, what a passenger is satisfied with is transportation, with a seat if one is to be had. As the case is presented, we must have regard, in defining the right of the plaintiff, to this habit of the traveling public. She got a seat herself, but she must be taken to have known the existing situation and to have understood that on the evening of a national holiday, within the limits of a great city, there would probably be other passengers who would not get seats, whose presence might incommode her during her ride and cause her at least some discomfort when she undertook to leave the car. On the other hand, the obligation of the defendant towards the plaintiff is affected by the same consideration. A common carrier is negligent if it fails to take a high degree of care to protect its passengers from every danger that the exercise of reasonable foresight would anticipate. *City Railway Co.* v. *Lee*, 21 *Vroom* 435, 438 ; *Consolidated Traction Co.* v. *Thalheimer*, 30 *Id.* 474, 475 ; *Whalen* v. *Consolidated Traction Co.*, 32 *Id.* 606, 610, 611 ; *Lehr* v. *Steinways and Hunters Point Railroad Co.*, 118 *N. Y.* 556 ; *Graham* v. *Manhattan Railway Co.*, 149 *N. Y.* 336. Common carriers habitually transport persons of every degree of bodily health and vigor, including the young and the aged and infirm of both sexes. That exit from a crowded car is likely to be attended, in the case of any passenger, with some difficulty, and in the case of a feeble person, with some risk of injury, is a matter of daily observation and familiar experience.

Reasonable foresight should anticipate the possibility of such danger and due caution should provide against it. The defendant was, therefore, bound specifically to use a high degree of care to protect the plaintiff, not indeed from crowding *per se*, but from danger likely to arise from crowding. Considerations of public policy strengthen this conclusion. If common carriers are to be allowed to cram their cars with passengers, to their own profit and the discomfort of the public, they should be held all the more to a strict and active responsibility to use due care to secure safe entrances and exits. Otherwise, the obligation of a plain duty will be weakened by embarrassments of their own creation.

It is important to consider, in every such case, whether the danger to the passenger was one that the common carrier should have foreseen. The inconveniences and risks incident to the discharge of passengers from a crowded surface car are notorious. The history of every day illustrates them. The Court of Appeals of New York, in *Lehr* v. *Lehigh and Hudson Passenger Railroad Co.*, *supra*, which was apparently a stronger case than this, thus expressed itself: "It clearly appears that the defendant undertook to carry more passengers than could sit and stand within the car, and that both platform and steps were filled to their utmost capacity. The action of persons so crowded together and the great force which they exercise, sometimes almost unconsciously, on each other, is understood by carriers of passengers and their employes, and the court would not have been justified in nonsuiting the plaintiff and holding as a matter of law that the exercise of reasonable foresight would not lead the defendant to anticipate that overcrowding the car and its platforms might render accidents like the one which befell the plaintiff probable."

Common carriers are, from the exigencies of their business, peculiarly familiar with these difficulties and risks, and adopt regulations for dealing with them. The defendant seems to have had such a regulation. It was the custom that when a crowded car stopped at the Junction both doors should be

opened, so as to provide a double exit. The employes in charge of a trolley car are clothed with what has been called, not inappropriately, a police power, for the protection of passengers. The exercise of this power devolves, in most cases, upon the conductor. In this instance the motorman, by opening the front door and right-hand gate, and so inviting passengers to alight at his end of the car, became responsible for the good order of the persons who accepted that invitation so far as a high degree of care on his part could secure it. He discharged the preliminary and the passive part of his duty. He opened the door and the gate, faced toward the door and stood observing the passengers as they came out. There was some evidence, but not much, that the outgoing persons were pressing forward so as to exert considerable force. There was distinct evidence that acts of violent rudeness were committed toward the plaintiff by a person or persons who stood behind her on the platform, and who must have been in the immediate presence of the motorman and probably within arm's length of him. The case is barren of proof that the motorman performed any active duty for the plaintiff's protection. Whether the case called for such activity, and whether, if it had been exerted, it might have been efficacious, are disputed or disputable questions of fact. It is worthy of remark, as bearing on the motorman's attentiveness to his surroundings, that though a woman, and she a passenger who had just left the car, lay prostrate and seriously injured on the fender, long enough for two persons to come from the sidewalk and extricate her, yet he, standing all the while on the front platform, knew nothing of this transaction until it was over.

The conclusion is that there was evidence to go to the jury, not merely as to whether the plaintiff's account of her injury was accurate, but as to whether, if her account was accurate, the accident was such that it might have been prevented by the exercise of due care on the part of the defendant. If the jury could answer this latter question in the affirmative they need look no further, for they might then infer negligence.

In such a situation the burden shifts, and the common carrier, in order to exonerate himself, must show, if he can, that due care was exercised. *Whalen* v. *Consolidated Traction Co.*, 32 *Vroom* 606, 609; *Laing* v. *Colder*, 8 *Pa. St.* 479; *Caldwell* v. *New Jersey Steamboat Co.*, 47 *N. Y.* 282.

The defendant relied upon the case of *Ellinger* v. *Philadelphia, Wilmington and Baltimore Railroad Co.*, 153 *Pa. St.* 213. There the plaintiff, a woman, was alighting at Wilmington from a train of the defendant and was thrown down and hurt by a man who, in rudely boarding the train, forced himself between her and the end of the step nearest to the body of the car. The court denied the plaintiff's right to recover, saying that it is no part of a common carrier's duty to protect its passengers against bad manners. It may be suggested that the true inquiry was whether the accident was one that could reasonably be anticipated. Of course a common carrier is not a *censor morum*, but if, under given circumstances, rudeness dangerous to personal safety is to be expected, it must be the duty of a common carrier to guard against it, not because it is unmannerly, but because it is likely to injure persons whom the carrier is bound to protect.

A leading case is *Putnam* v. *Broadway and Seventh Avenue Railroad Co.*, 55 *N. Y.* 108 (1873), and better known as the Car Hook case. The action was brought to recover damages for the death of Avery D. Putnam, the plaintiff's intestate, who was fatally injured by William Foster. Both were passengers on a horse car of the defendant. The ground of action was the alleged failure of the employes in charge of the car to exercise the police power with which they were invested for the protection of passengers. A judgment for the plaintiff was reversed, upon the ground that the conductor had no reason to apprehend that Foster would commit a murderous assault.

The case of *Thomson* v. *Manhattan Railway Co.*, 75 *Hun* 548, was this: The plaintiff, a woman, about the 1st of June, 1888, was a passenger on defendant's road. While seated in a car, one of her feet was trodden on by a fellow passenger,

drunk, but not boisterous, who stood nearly in front of her, holding on to a strap. About three years later the plaintiff alighted from a crowded train on defendant's road, in the early evening, at the City Hall station, in New York City. She landed safely and had taken a few steps on the station platform, when another person stepped on the same foot and inflicted a second injury. She sued the company. At the trial her complaint was dismissed. On appeal to the General Term of the Second Department the judgment was affirmed, on the ground that neither injury could have been reasonably anticipated, or by due care averted.

In the case of *Buck* v. *Manhattan Railway Co.*, 15 *Daly* 48, the head-note is as follows : " Plaintiff, a passenger on defendant's elevated railroad, while attempting to get off the platform of a car at his station, was forced between the car platform and the station platform by others boarding the train, and was injured ; in an action therefor, it did not appear that any precaution was taken by the guard upon such platform to prevent incoming passengers from interfering with plaintiff in his effort to leave the train. *Held*, that the question of negligence in such particular should have been submitted to the jury and a dismissal of the complaint was error." Accordingly the General Term reversed the judgment and ordered a new trial. At the second trial the plaintiff recovered a verdict, which was set aside by the General Term because the trial judge left it to the jury to say what precautions the defendant ought to have taken, instead of confining their attention to the precise issue. *Buck* v. *Manhattan Railway Co.*, *Id.* 276. There was then a third trial, at which the defendant seems to have recovered a verdict, which was affirmed by the General Term and by the Court of Appeals without an opinion. *Buck* v. *Manhattan Railway Co.*, *Id.* 550 ; *S. C.*, 134 *N. Y.* 589. There was no crowd at the place of the accident. Only two passengers, including the plaintiff, alighted from the car, and only three persons boarded it. The various phases of this litigation are conveniently reported in 5 *Am. Neg. Cas.* 745, 755.

Other cases are *Lafflin* v. *Buffalo and Southwestern Railroad Co.,* 106 *N. Y.* 136; *Hayman* v. *Pennsylvania Railroad Co.,* 118 *Pa. St.* 508; *Graeff* v. *Philadelphia and Reading Railroad Co.,* 161 *Id.* 230. It may be generally said of this line of authorities that they are attempts to apply to widely different states of fact the distinguishing principle that the risks against which a common carrier should try to guard its passengers are only those that reasonable foresight will anticipate. This does not mean that the accident must be foreknown, or that exactly such an occurrence was expected or apprehended, but rather, more generally, that its characteristics must be such that it can be classified among events which, sooner or later, in the absence of due care, were likely to happen, and which due care would prevent.

The judgment is reversed.

GARRISON, J. (dissenting). When a crowded trolley car stops to let off its passengers at a junction where all of its passengers must alight, it is a reasonable inference that the persons who were standing in the aisles of the car between the doors got out before a given person who was seated in the body of the car.

Where the person so seated was an elderly woman who kept her seat in the car until it stopped and who had first started to go out by the rear door and afterward when the front door was opened had gone out by that door, the above inference, nothing more appearing, is the only legitimate one.

So long as this inference obtains the plaintiff's injury in being pushed from the front platform is no more referable to the fact that passengers had been standing during the trip than if that circumstance had existed upon a previous trip or upon a trip upon a previous day. With this inference in the case it will not be assumed without any proof, that the push that the plaintiff complains of was given by a passenger who had been unable to obtain a seat in the car, by reason of its crowded condition.

If the crowded condition of the car be eliminated from the

legal consideration of the case, the plaintiff must rely upon the contention that the push could have been prevented by those in charge of the car by the exercise of reasonable care. To this the complete answer is that the daughter of the plaintiff who had got off the car in advance of her mother for the express purpose of helping her to alight, and who was waiting for that purpose, saw no such circumstance. A circumstance of this nature that escaped the individual attention of this daughter will not, without a shadow of testimony, be deemed to have been discoverable by the agents of the company in their general exercise of a reasonable care. I shall vote to affirm the verdict directed by the trial judge.

*For affirmance*—DEPUE (CHIEF JUSTICE), VAN SYCKEL, GARRISON, GUMMERE, HENDRICKSON, VOORHEES.    6.

*For reversal*—MAGIE (CHANCELLOR), DIXON, LUDLOW, COLLINS, BOGERT, ADAMS, VREDENBURGH.    7.