[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 110 
The questions presented upon this appeal are founded upon exceptions to the refusal to nonsuit the plaintiff at the close of the trial. If the evidence upon any view that can be taken of it entitled the plaintiff to a verdict, the judgment must be affirmed. The case was submitted to the jury with great fairness, and with accurate instructions as to the law, if there was in truth any evidence of a neglect of duty, or want of care on the part of the servants and agents of the defendant to which the injury to and death of the plaintiff's intestate could legally be attributed.
The cases bearing upon the liability of railway companies, and other carriers of human beings as passengers for hire, for any defect in their roadways, carriages and other vehicles of transportation, any neglect or want of care by themselves, their agents or servants in the performance of the service undertaken, and for injuries caused by or resulting directly from the acts of the carrier or his servants, either to the passenger or third persons, may be laid out of view, except as they serve to indicate the stringency and extent of the liability imposed by law upon carriers, and the extreme care and diligence required of them, in all that concerns their own acts and the agencies and means employed by them. The acts, neglects and omissions complained of here, upon which the action is based, do not come within either class of cases referred to. The passenger was carried in a safe and proper manner, and there is no complaint of injury from any defect in the means of conveyance, or any act or omission of duty on the part of the servants of the company in respect to the plaintiff's intestate personally. The wrong and injury complained of is the wanton and unprovoked *Page 113 
as well as unlooked-for attack of a fellow-passenger, resulting in the death of the individual assailed, and the defendant is sought to be charged for the resulting damages on the ground that the servants and agents of the company, in charge of the car, negligently and improperly omitted to exercise police powers with which they are invested for the protection of well-disposed and peaceable passengers.
There is no such privity between a railway company and a passenger as to make it liable for the wrongful acts of the passenger upon any principle. (Pittsburgh, F.W. C.R. Co. v.Hinds, 53 Penn. St. R., 512.) But a railroad company has the power of refusing to receive as a passenger, or to expel any one who is drunk, disorderly or riotous, or who so demeans himself as to endanger the safety or interfere with the reasonable comfort and convenience of the other passengers, and may exert all necessary power and means to eject from the cars any one so imperiling the safety, or annoying others; and this police power the conductor, or other servant of the company in charge of the car or train, is bound to exercise with all the means he can command whenever occasion requires. If this duty is neglected without good cause, and a passenger receives injury, which might have been reasonably anticipated or naturally expected, from one who is improperly received, or permitted to continue as a passenger, the carrier is responsible. (Pittsburgh, F.W. C.R.Co. v. Hinds [supra]; Flint v. Norwich and N YTransportation Co., 34 Conn., 554; 6 Blatch. C.C.R., 158.) In the case first cited, a passenger was seriously injured by a large body of drunken and riotous persons, who came upon the train in defiance of the conductor in charge; and the court in banc held that, upon the evidence in that case, the only question which should have been submitted to the jury was whether the conductor did all he could to quell the riot and eject the rioters, and that if he did not the company was liable. The judge at nisi prius having submitted other questions, to wit, whether the conductor allowed improper persons on the train, and whether he allowed more persons on *Page 114 
the train than was proper, a verdict for the plaintiff was set aside, and a venire de novo ordered. In the other case, the action was for an injury received by the plaintiff, a passenger on the defendants' steamboat, from the falling and consequent discharge of a loaded musket, by one of a great number of riotous and drunken soldiers engaged in an affray, and occupying a part of the boat assigned to passengers, the plaintiff being suffered to enter the boat and pass to this part of it without any warning from the officers of the boat, or others, of the presence of these soldiers, and the defendants making no effort to preserve the peace or remove the offenders. Upon conflicting evidence the jury found for the plaintiff. Judge SHIPMAN in his charge to the jury instructed them that "the defendants were bound to exercise the utmost vigilance in maintaining order, and guarding the passengers against violence, from whatever source arising, which might reasonably be anticipated, or naturally be expected to occur in view of all the circumstances, and of the number and character of the persons on board." This, as a rule of duty and liability, is in strict analogy and consistent with the rules by which the liability of common carriers of persons for hire is determined in other cases, and seems to be well expressed and properly limited. It may be conceded that Foster, the individual who inflicted the injury resulting in the death of the plaintiff's intestate, was drunk when he came on the car; but so long as he remained quietly by the driver on the platform, neither entering the car, nor molesting or annoying the passengers in any way, there was no occasion for removing him, and the conductor would not have been justified in refusing to permit him to remain as a passenger. The fact that an individual may have drank to excess will not, in every case, justify his expulsion from a public conveyance. It is rather the degree of intoxication, and its effect upon the individual, and the fact that, by reason of the intoxication, he is dangerous or annoying to the other passengers, that gives the right and imposes the duty of expulsion. *Page 115 
While Foster remained on the platform of the car, neither interfering with or noticing the other passengers, there was nothing to indicate to the conductor that his presence was offensive to the passengers, or that there was danger of harm to any one from him. There was during that time no occasion, and would have been no propriety, in causing his removal from the car. He did, however, thereafter make himself peculiarly obnoxious to the other passengers, and by his conduct and demeanor grossly insult and annoy them, and gave occasion for the exercise of the power of removal, had the conductor seen fit, or been called upon to exercise it; and had he continued his annoying practices the conductor would have been faithless to his duty had he suffered him to remain on the car. After Foster came into the car, and insulted and intimidated the females under the protection of the deceased, the latter appealed to the conductor, not to exclude Foster from the car, but to make him be quiet, and the conductor directed him to sit down and be quiet, and he did thereupon take a seat on the opposite side of the car from the females, and near the deceased, and after remaining there a short time left the car, and took his place on the front platform, the front door of the car being closed, and, during the residue of the passage to Forty-sixth street, gave no occasion of complaint so far as appears. He was during that time peaceable and inoffensive. During this latter part of the ride there was no occasion for removing him from the car, unless the occasion and a necessity for such removal was furnished by his previous conduct, showing that he was a dangerous or improper person to remain. He had ceased to address or in any way to insult or annoy the females, upon being requested by the conductor to sit down and be quiet; and his ready compliance with that request, and his taking his place soon thereafter on the platform, and proceeding quietly and peaceably on his journey, was some evidence that there was no reason to apprehend a renewal of his insults in that direction, and justified the conductor in at least giving him the benefit of a further probation. This was precisely in accord *Page 116 
with the suggestion of the deceased; neither he or the conductor apprehending any serious harm or injury, certainly not a wanton and murderous attack upon any one with a dangerous weapon. It is true that, on taking his seat, he did not observe the strictest rules of propriety, and, by putting his feet on the seat, violated good taste and good manners; but it was not an offence of which the passengers could very seriously complain, or which essentially violated their rights, so long as there was abundant room for all, and there was no indecency in the position. This breach of good manners certainly did not tend to show that he was a dangerous man, and was condoned by his subsequent withdrawal from the seat and the body of the car entirely. It is also in evidence that, while seated near the deceased, he directed abusive language to him, and made threats indicating an intent to do him some bodily harm before he left the car. But all this was in an under tone, and, so far as appears, was unheard by the conductor, occupying his proper place on the rear platform, and neither the deceased nor any one else called the attention of the conductor to it. It was probably treated with indifference by the deceased and all who heard it, and regarded as the maudlin and senseless gabble of a drunken man, unworthy of notice, and incapable of creating any apprehension of danger or harm. But be this as it may, there is no evidence to justify an inference that the conductor did hear, or could have heard or known of the abuse or threat, so that to him they were not evidence that he was an unsafe and dangerous man, or that there was any reason to apprehend injury to the other passengers from him or his acts.
The conductor was only called upon to act upon improprieties or offences witnessed by him, or made known to him in some other way, and the defendants can only be charged for neglect of some duty arising from circumstances of which the conductor was cognizant, or of which he ought, in the discharge of his duties as conductor, to have been cognizant.
There was no evidence tending to show that the conductor *Page 117 
was in fault for not removing the person of Foster from the car. He exerted his police powers by causing him to desist from his offensive acts and approaches toward the females, and supposed that he had done all that was necessary to preserve the peace and keep good order upon the car, to secure the other passengers against further annoyance, as well as all that the deceased asked him to do. If the peace could be preserved and the quietness and comfort of the passengers could be secured, as he supposed he had done, without the expulsion of the offender, the conductor could hardly have been called upon to proceed to extremities and put the latter from the car by force. An unnecessary resort to force, in ejecting a passenger from the car, might have given the passengers, male as well as female, more pain and annoyance than would the mere presence of a drunken man, and possibly might have seriously imperiled their persons. There was no evidence of any neglect of duty on the part of the conductor in omitting to remove the person of Foster from the cars; and whatever may be the duties or powers of the driver, except as he is in subjection to the conductor, there is no evidence that he had any notice or knowledge of any impropriety of conduct or the threatening language on the part of Foster, except as he must have witnessed what passed before Foster entered the car. There is no evidence that he had knowledge of what transpired within the car; and after Foster's return to the platform, there was nothing, so far as appears, to excite alarm, or create apprehension of danger or disturbance or annoyance of any kind. There was an entire absence of evidence of any connection or complicity of the driver with Foster, or that the driver was responsible for the possession by the latter of the iron instrument with which the blows were inflicted that caused the death of Putnam. There was no proof from whence or of whom Foster obtained it, and none to show that the driver either acquiesced in or assented to the taking of it by Foster, or that he knew that Foster had it. There was no evidence of negligence or omission of duty, or want of proper care and *Page 118 
vigilance on the part of the servants and agents of the company in preserving order and keeping the peace on the cars, and protecting the passengers, to be submitted to the jury; most certainly, none connected with the attack upon and death of the intestate, or to which it can be legally or logically traced. The rule cannot be better or more concisely expressed than as stated by Judge SHIPMAN in Flint v. Norwich N.Y. TransportationCo. (supra): "That for any neglect or omission of duty in the preservation of order and the removal of dangerous and offensive persons by the owner of a public conveyance for the transportation of passengers, or his servants or agents, the carrier is liable for any injury to other passengers which might reasonably be anticipated, or naturally be expected to occur in view of all the circumstances, and of the number and character of the persons on board." It does not follow and cannot be presumed that because a man is drunk, and is, in that condition, offensive to others, as well by his demeanor as in his appearance, that he is a dangerous man, and that his presence imperils the safety of others; that because he is drunk he may violently assault or murder others without provocation.
If there was anything in the condition, conduct, appearance or manner of Foster from which the jury could reasonably infer that there was reason to expect or anticipate an attack upon the deceased, or any other passenger, either while upon the car, or in the act of leaving, the facts authorizing such inference should have been proved, and knowledge of them brought home to the conductor. The injury to and death of Mr. Putnam was immediately and directly caused by the murderous attack of Foster, and the carriage of the murderer by the defendant had no connection with and did not cause the act or directly contribute to it.
It is said in McGrew v. Stone (53 Penn. St. R., 436) that the general rule is that a man is answerable for the consequences of a fault, which are natural and probable; but if his fault happen to concur with something extraordinary and not likely to be forseen, he will not be answerable. *Page 119 
Ch. J. BOVILL, in Sharp v. Powell (L.R., 7 C.P., 253), uses this language: "No doubt one who commits a wrongful act is responsible for the ordinary consequences which are likely to result therefrom; but generally speaking he is not liable for damage which is not the natural or ordinary consequence of such an act, unless it be shown that he knows or has reasonable means of knowing that consequences not usually resulting from the act are by reason of some existing cause likely to intervene so as to occasion damage to a third person." The law ordinarly looks only to the proximate cause of an injury, in holding the wrong-doer liable to an action; and if the damage is not the probable consequence of a wrongful act, it is not the proximate cause, so as to make the wrong-doer liable. (See Marsden v. City andCounty Assurance Co., L.R., 1 C.P., 232; Bigelow v. Reed,51 Maine 325; Railroad Co. v. Reeves, 10 Wallace, 176.) This is the rule in cases of tort, when the conduct of the defendant cannot be considered so morally wrong or grossly negligent as to give a right to vindictive or exemplary damages. (Baldwin v.U.S. Tel. Co., 45 N.Y., 744; Boyle v. Brandon, 13 M. W., 738.)
The assault by Foster upon the deceased could not have been foreseen, and it was not the reasonable or probable consequence of the omission of the conductor to eject him from the car, and upon principle as well as upon authority the injury was too remote to charge the defendant for the damages. In Scott vShepherd (2 W. Bl., 892), Guille v. Swan (19 J.R., 381) andVandenburgh v. Truax (4 Den., 464), the injuries were held to be the natural and direct result of the conduct of the party charged, although he did not intend the particular injury which followed.
There was no evidence to carry the case to the jury, and the motion for a nonsuit should have been granted.
The judgment must be reversed, and a new trial granted.
All concur.
Judgment reversed. *Page 120