KLINE, Respondent, vs. MILWAUKEE ELECTRIC RAILWAY & LIGHT COMPANY, Appellant.

*March 17—May 2, 1911.*

*Railroads: Protection of passengers from assault: Duty of conductors: Ejection of drunken passenger: Liability: Evidence.*

1. The conductor on an interurban car, even though he may not be required to infer that a passenger, drunken, noisy, and obscene, will assault and strike any of his fellow passengers, is bound in the exercise of ordinary care to keep a vigilant supervision over such passenger to prevent his injuring or annoying others, and should either remove him or cause him to be removed from the car.

2. Evidence showing that the conductor had notice of the boisterous and quarrelsome condition of a drunken passenger, and that he ignored several requests of other passengers to expel the of-

Kline v. Milwaukee E. R. & L. Co. 146 Wis. 134.

fender and left them to protect themselves as best they could, was sufficient to warrant a finding by the jury that the conductor failed to perform his duty to protect the other passengers.

3. If in such case the conductor knew or ought to have known that some injury to another passenger was threatened or was probable, and by prompt intervention he might have prevented it, the railway company is liable for such injury resulting from the conductor's omission of duty.

APPEAL from a judgment of the municipal court of Kenosha county: CLIFFORD RANDALL, Judge.    *Affirmed.*

For the appellant there was a brief by *Van Dyke, Rosecrantz, Shaw & Van Dyke,* and oral argument by *Clarke M. Rosecrantz.* They cited *Putnam v. Broadway & S. A. R. Co.* 55 N. Y. 108, 115, 116, 118; *Thompson v. Manhattan R. Co.* 75 Hun, 548, 27 N. Y. Supp. 608; *Mullan v. Wis. Cent. R. Co.* 46 Minn. 474, 49 N. W. 249; *Sira v. Wabash R. Co.* 115 Mo. 127, 37 Am. St. Rep. 386, 391; *Galveston, H. & S. A. R. Co. v. Long,* 13 Tex. Civ. App. 664, 36 S. W. 485; *Widener v. Philadelphia R. T. Co.* 224 Pa. St. 171, 73 Atl. 209; *Ill. Cent. R. Co. v. Gunterman,* 135 Ky. 438, 122 S. W. 514.

*Calvin Stewart,* for the respondent.

TIMLIN, J.    This is an action by a passenger to recover from the defendant, an interurban carrier, damages caused by a knife wound inflicted on plaintiff by another passenger. The jury found that the defendant's conductor, in the exercise of ordinary care, ought to have known from the conduct of the assaulting passenger that a physical injury to one of defendant's passengers was threatened, and should have attempted to prevent such injury.  This want of ordinary care on the part of the conductor was the proximate cause of the injuries complained of, and there was no contributory negligence.    It is contended that there is no evidence to support the finding that there was negligence on the part of the conductor.    The testimony is not very satisfactory.    Taking that

of defendant's witnesses, there was no negligence on the part
of the conductor because the murderous assault followed
swiftly the first indications of danger.    Taking that version
of the testimony most favorable to support the verdict, it
would appear that the plaintiff boarded an interurban car at
Kenosha, apparently bound.north for Racine.    He first took
his seat in the main body of the car, and he was stabbed while
sitting in the rear or smoking compartment of the car by a
passenger called Rose, who with another passenger, known in
the case only as "Rose's partner" (R. P.), also boarded the
car at Kenosha and remained in the smoking compartment.
The witness Hammer was sitting in the body of the car on a
seat next to the smoking compartment and facing north, and
near him and also in the body of the car were the plaintiff
and his six or seven-year-old daughter.    According to this
witness, the whole time covered from Kenosha to the place
where the stabbing occurred was five or six minutes and the
car had covered a distance of several miles, passing several
stopping places.    The sequence of events was as follows:
(1) Grossly obscene language by Rose continuing.    (2) An
affray betwen Rose and R. P., in which the hat of one was
knocked off his head and out of the car.    (3) An attempt by
one to pull the bell cord and stop the car.    (4) Conductor
having begun to take up fares and tickets at front or north
end of the car reached in so doing the last seat in the main
body of the car on which Hammer was sitting and took Ham-
mer's fare or ticket, and Hammer asked him to stop the car
and put Rose off.    (5) Conductor entered the rear or smok-
ing compartment and tried to collect fares there and had an
argument.    (6) Conductor came out of the smoking compart-
ment into the body of the car and proceeded up to the front
end.    (7) *Mr. Kline* left his little daughter with Hammer
and went back into the smoking compartment to try to stop
the use of obscene language, and asked Rose to quit the use of
such language, and the latter, who was then struggling with

some others, stabbed *Kline*.   (8) Conductor and others over-powered Rose and took his knife.

Some of plaintiff's witnesses vary from this.   The witness Leo S., who testified through interpreter, rode in the smoking compartment, and the sequence of events according to him was: (1) Car started and Rose and his partner began to have some "kind of an interfering."   (2) Conductor came to the smoking compartment to collect tickets.   Rose could not find his ticket.   Conductor took up the ticket of Leo S. and said to him, referring to Rose and his partner, "These snakes are mad."   Leo S. replied to conductor, "You better stop the car and throw them off because they are looking for trouble." (3) Conductor went to the other compartment.   Rose began to swear and use obscene language, struck his partner, and knocked his hat out of the window.   (4) R. P. stood up and tried to ring the bell to stop the car.   (5) Leo S. called the conductor to stop the car and conductor motioned with his hand.   (6) Rose opened his valise and took out a hat for his partner and began to swear again.   (7) The conductor came from the front to the hind end, and Leo S. said to the con-ductor for the third time, "Please stop the car and throw these men off.   This man looks for trouble."   (8) Rose made a menacing gesture toward the conductor (showed him the back of his hands).   (9) Leo S. requested Rose to stop this lan-guage which Rose had been using from the time the car started until he stabbed *Kline*.   (10) Rose jumped at Leo S. with his knife and the hands of the latter were full of blood.

The sequence of events according to Adam Kikosicki, who rode in the smoking compartment, was: (1) Language passing between Rose and his partner witness did not understand. (2) A fist fight between Rose and his partner.   (3) A hat of one knocked off out through the window.   (4) One attempted to seize the bell cord to stop the car.   (5) Conductor entered smoking compartment, took up witness's ticket.   Rose had no ticket. (6) Conductor went forward to collect fares.   (7) Rose

again began to use abusive language. (8) Leo S. remonstrated to conductor, informing the latter, "Try to do something with those boys because you may have trouble." (9) Conductor stood in the smoking compartment for a while. (10) Conductor went to the center of the car. (11) Conductor returned to the smoking compartment again. (12) Leo S. said to the conductor again, "Try to do something with those boys because you will have trouble." (13) Conductor did not answer, but went out of the smoking compartment. (14) Rose drew his knife and tried to stab Leo S. The latter warded off the blow. (15) Rose tried to stab Leo S. again and struck the plaintiff.

According to Walter Kikosicki the sequence of events was: (1) Obscene language on the part of Rose. (2) Quarrel between Rose and his partner and blows. (3) Knocking off the hat. (4) Attempt to pull the bell cord. (5) Request by Leo S. to the conductor that he stop the car and put Rose off. (6) Remonstrance by Leo S. to Rose against the use of this language. (7) Attack by Rose with a knife on Leo S. (8) Leo S. warded off blow of the knife and the blow fell on *Kline.*

The testimony of the several witnesses is more or less vague as to the period of time in which these events occurred. But there is the positive testimony of several witnesses that the conductor had his attention called to the conduct of the passenger Rose two or three times before the stabbing occurred. Not only was his attention called to this obstreperous passenger, but there was said to him what was equivalent to a request for protection. If the testimony of several witnesses be taken as true there was some interval between these requests. The outrageous conduct of Rose began when he entered the car and continued up to the time of the stabbing. The conductor was in the smoking compartment and endeavored to collect fare from Rose. While the conductor might not be required to infer that a passenger, drunken, noisy, and obscene, would assault and strike any of his fellow passengers, yet he would

in the exercise of ordinary care be required to keep a vigilant supervision over such passenger for the purpose of preventing him injuring or annoying the other passengers, and he should refuse to carry such passenger on his train, and either himself remove him or telephone for the public authorities if necessary to remove such passenger. The duty of a conductor in such emergency is no doubt delicate and difficult and his responsibility is heavy. But this is true of many relations in life. Assuming there was evidence to show that the conductor had notice of this boisterous and quarrelsome condition of the passenger Rose, and that he ignored several requests from other passengers to expel this passenger, and that he left the other passengers to protect themselves as best they could, there was sufficient for the jury to find that the conductor did not exercise his duty to protect the other passengers. *Brown v. C., R. I. & P. R. Co.* 139 Fed. 972, 3 Am. & Eng. Ann. Cas. 251, and cases in note; *Hillman v. Georgia R. & B. Co.* 126 Ga. 814, 8 Am. & Eng. Ann. Cas. 222, and cases in note. It is necessary in such case to bring home to the conductor knowledge or opportunity to know that some injury was threatened or was probable and to show that by his prompt intervention he might have prevented or mitigated it. But these are the ultimate conclusions which the jury may draw from any competent evidence legally tending to establish them. There was such evidence in this case. Where the injury could not have been foreseen or was not the reasonable or probable consequence of the omission of the conductor to eject a drunken passenger from the train, the railroad is not liable. *Putnam v. B. & S. A. R. Co.* 55 N. Y. 108. The instant case is not one where this court can say that this appears as a conclusion from the evidence. It follows that the judgment of the circuit court should be affirmed.

*By the Court.*—Judgment affirmed.