**FT. WORTH & R. G. RY. CO. v. STEWART.†**

(Court of Civil Appeals of Texas. Austin. Feb. 7, 1912. Rehearing Denied March 27, 1912.)

1. CARRIERS (§ 318*)—CARRIAGE OF PASSENGERS—ACTIONS—EVIDENCE.

In an action against a carrier for an assault made on plaintiff while a passenger, evidence *held* to warrant a finding that the conductor was negligent in failing to stop the train, and remove the offensive passenger who committed the assault.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1270, 1307–1314; Dec. Dig. § 318.*]

2. CARRIERS (§ 284*)—CARRIAGE OF PASSENGERS — PROTECTION OF PASSENGERS — DUTY OF CONDUCTOR.

Where a railroad conductor apprehended that a drunken passenger would do bodily injury to another passenger, and advised the latter to go into another car, the conductor was guilty of negligence in failing to protect plaintiff or eject the drunken passenger.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1125–1135, 1173, 1222; Dec. Dig. § 284.*]

3. APPEAL AND ERROR (§ 1033*)—REVIEW—HARMLESS ERROR—INSTRUCTIONS.

In an action against a railroad company for an assault made on plaintiff by another passenger, where the charge authorized a verdict for defendant if it was not guilty of negligence, the refusal of a requested charge that if the conductor came to plaintiff in the compartment of the car where he was riding, and told plaintiff that he was in danger of bodily injury, asking him to go back in another car, and under the circumstances plaintiff should have gone with the conductor into the other car, verdict should be given for defendant, if the act of the conductor was a sufficient precaution, and the circumstances did not require him to take other steps for plaintiff's protection, was not prejudicial; the requested charge imposing a greater burden on defendant than the one given, and not submitting the question of contributory negligence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4052–4062; Dec. Dig. § 1033.*]

4. NEGLIGENCE (§ 80*)—CONTRIBUTORY NEGLIGENCE.

Plaintiff cannot recover if his own negligence contributed to the injury.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 84; Dec. Dig. § 80.*]

Appeal from District Court, Brown County; John W. Goodwin, Judge.

Action by A. M. Stewart against the Ft. Worth & Rio Grande Railway Company. From a judgment for plaintiff, defendant appeals. Affirmed.

C. L. McCartney, of Brownwood, and Andrews, Ball & Streetman, of Houston, for appellant. T. C. Wilkinson, of Brownwood, for appellee.

KEY, C. J. In this suit appellee sought and recovered damages from appellant on account of an assault made upon him by a fellow passenger while riding on one of appellant's trains. While a number of questions are presented in appellant's brief, we deem it unnecessary to discuss but two of them, and these are the sufficiency of the evidence to show liability, and the refusal of a requested charge. The plaintiff's case rests alone upon his own testimony, which, omitting some relating to the extent of his injury, is as follows:

"My name is A. M. Stewart, and I am the plaintiff in this case. I am on the road all the time. I have a place here in Brownwood, and have been making Brownwood my headquarters. I call Dallas my home. That is where I work from. Dallas is my headquarters. The people I work for are at Dallas, and I am on the road all the time, but I have made Brownwood headquarters for two years. I own property here in Brownwood, and I stay here part of the time. I understand the allegations of the petition in this case. On the 15th day of May, 1908, I came from Dallas to Ft. Worth to catch the early Frisco train in the morning. I got me a bed, and went to bed and slept until about 2:30, and then went down to the train and bought my ticket, and got on the train, and went in the chair car, and it was all full of people. Every seat was taken, and everybody was sleeping in there. I went into the smoker, and there was a lot of people sleeping in there, and a good deal of noise and nearly all the seats taken, and I passed on to the little compartment that was partitioned in the front end of the car, about four seats. There was some other gentlemen lying on the right-hand side, and I taken the two seats on the left-hand side, and laid those together and went to sleep, and away long in the night, of course, the conductor came through and taken up our fares, and I then went to sleep again, and I don't know, it must have been somewhere about 4 o'clock in the morning, I was awakened by a fellow having his foot over the seat, and across my neck, which excited me, of course, and I grabbed the fellow by the ankle, and knocked his foot off of my neck, and look up, and Mr. Blythe, the conductor, and this fellow, was fighting; that is, this fellow had Mr. Blythe around the throat with both hands, and two or three other fellows had hold of this man, pretending to pull him off, and he had his foot over the seat and across my neck, and, when they pulled him loose, pulled hard enough to pull him loose, he turned loose with one hand and commenced pounding him over the head with his fist, and, when they got him loose, Mr. Blythe passed into the large room of the smoking compartment, and I told those fellows about the time Mr. Blythe left to go into the other end of the car, as soon as they pulled this fellow loose, I says: 'It looks to me like you fellows might find some other place to fight, instead of fighting over me.' I was addressing Mr. Blythe, too. Mr. Blythe passed on, and didn't reply. This fellow says: 'By God, maybe you don't like it.' I says: 'I

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

† Writ of error granted by Supreme Court.

don't like it. I am a passenger on this train, like you are, and not mixed up in your fights at all.' And there was a considerable quarrel followed, and he run his hand in his pocket as though he was going to pull a gun, and I says: 'Young man, you are too close to me to pull a gun. I will knock you through that window too quick to think about. I am just as liable to use it as you are.' And there were several words passed between us, and they passed back out at the front end of the car on the platform. I heard talking out there. There were four of these fellows, and they all went out together. I might be mistaken about there being four. There might not have been but three; but I am pretty sure there was four of them. In a few minutes Mr. Blythe came back, and it looked to me like they met in the same place, and they passed some words and licks. I sat there in my seat, and never taken any hand. I thought I was out of it. I had had my say, and was perfectly satisfied, and Mr. Blythe and them passed into the large end of the compartment. While they were fighting there the second time after they had come in from the front end, and Mr. Blythe had met them, they didn't say anything to me until after the fight.

"After they had this fight then they began to abuse me again. I think the fight was all over when Mr. Blythe passed into the car, and then they abused me for everything they could think of. I says: 'There are four of you fellows. I can't fight all of you.' At the time these fellows were talking to me, Mr. Blythe was standing in the door, listening to them. He stood there part of the time. I don't know just how long. I was watching them, because I was expecting them to assault me all the time. I was on the next seat to that door. One seat was immediately behind the door and the other was the usual distance; and I think I was sitting on the seat next to the door, the back seat. They abused me, and called me a damned son of a bitch, and everything in the world you could think of. Mr. Blythe was standing in the door, listening to them part of the time. I don't know that he stayed there all the time, but I know he was standing in the door. They called me everything, names that I wouldn't like to mention the very words, and I told them, I says. At that time they didn't make any motions at me, but they passed on. After they had that scrap, they stood and talked to me. You know a minute is a right smart bit, but I reckon probably a minute or two minutes or a little longer. The fellow that afterwards struck me with the bottle did that talking. The other fellows didn't do a thing, only just listened. They didn't try to quiet the fellow that was talking. They never said a word. They were all drinking. This fellow that was talking was drunk enough to stagger. After these fellows had left the place

where I was and had gone into the other compartment, in about five minutes, I should judge it was, I couldn't say positively, but it was at least five minutes or probably longer, Mr. Blythe came back into this little compartment where I was. I was in there alone. When I first went in there to go to sleep, there was another man in there, but in the meantime he got up and got out. I don't know where. Mr. Blythe came back, and says, 'Stewart, I believe, if I was in your place, I would get up and go in the chair car. Those fellows are liable to do you bodily harm.' He says: 'Did you notice that fellow keep putting his hand on his hip pocket?' I told him, 'Yes.' He said, 'I would go back in the chair car where there is more people.' And he walked on out, and I stood there and studied about a minute, and I thought, 'Now for peace sake, and to stop this trouble, I had better do that, but it looks like I am running.' And I picked up my suit case, and pushed the door open with this crippled arm, had my suit case in my right hand, and after I had passed through the door, and gone, I guess, three or four steps from the door, the coach was pretty dark, just about one light in it, pretty dark, it wasn't lighted up bright at all, this fellow raised up in his seat, he was sitting, I think he had his seat turned towards where I was and right backwards, I was in the front end, he raised up in this seat, and lammed me across the head with a bottle of whisky. The whisky flew all in my face, and I had on a panama hat, and the brim was turned up, and the bottle cut the brim of the hat against the crown, and cut a hole in both of them and knocked me senseless for a minute, knocked me clear around, and, when I turned around to pick up my hat, I looked back between me and this little door I had come through, and one of those fellows had his sleeves rolled up above his elbows, and the blood was streaming down his arm. He was wiping the blood off with his other hand. The fellow that struck me was gone before I knew anything at all about it. I was addled for a minute or so. I then picked up my hat, and picked up my suit case, and went back in the chair car, and set my suit case down and bathed my face and head. Blood was oozing out of my head. He struck me right above the ear there. I have got a knot there yet, part of it, and that has been two years ago. I couldn't tell you what size bottle that was, but it felt like it weighed about 40 pounds to me. I never had a lick like that before. He didn't say a word when he struck me. At the time I got up to go out, the conductor hadn't waited for me to go out with him. He just told me: 'I would advise you to get out of this car, and go back where there are other people. You are liable to be done bodily harm.' And I asked Mr. Blythe, I says: 'What is all this about, Mr. Blythe?' And he says, 'Well, that fellow got on the train. He

was one of the fireman at Waco, and got on the train, a crowd of them, at Ft. Worth, and, when he went through taking up tickets, I asked Mr. Blythe what all that trouble was about, and he said that these parties got on at Ft. Worth, and were drinking, and he said after they had left Ft. Worth, or after we had left Ft. Worth, that he came through taking up the fares, and that, when he came to this party, he said that he couldn't find his ticket, and he made him pay his fare, and he said, when that party came back in there and jumped on him, he had found his ticket in the meantime, and had come back to him to get him to refund his money and take the ticket, and Mr. Blythe said that he wouldn't do it, and told him how to do it, to turn it in to the ticket agent. Mr. Blythe said something about having quarreled with him before that time. He said they had a fuss about this money, this transportation, that the fellow couldn't find his ticket, and he made him pay his fare, and he got mad about it, and when he was choking Mr. Blythe, and after they pulled him loose, he says, 'Jim, I have known you too long for you to treat me that way;' and I asked Mr. Blythe who Jim was after I was knocked in the head, and I asked him who this fellow was that called him Jim, when he says, 'Jim, I have known you too long for you to treat me that way.' Mr. Blythe didn't tell me that he knew him. He said he had rode on his train lots of different times, but he never knew his name. These fellows got off at Stephenville. I saw them get off on the north side of the train. They didn't get off on the depot side, but got off on the opposite side, this fellow with his arm cut and another one of these firemen. I didn't see the man that struck me after I got to Stephenville.

"I went on from there and got off at Dublin, and had Dr. Farmer, I believe his name is, had the Commercial Hotel man to call a doctor to dress my head, and he came down and dressed my head, and gave me some medicine, and told me to be quiet that day. In fact, I had such a knot on my head that I couldn't wear my hat; that knot was where I was struck; that wound went on that way about six or eight months I guess, and then my ear began to discharge. It was very much swollen all the while, and I had a very sore place over that wound back of my ear. It was inflamed, and in about six months it broke and began to run. The inside of my ear broke, and I kept cotton in it for a long time. I went to see Dr. W. B. Anderson of Brownwood, the specialist, about it, and he examined my ear. I also went to see Dr. Burgess, another specialist here. They didn't treat my ear. I am as deaf as a post in that side. I can't hear at all in that side. I couldn't hear all the time hardly my ear was discharging, and before that it affected me, but, of course, as I say, I kept cotton in my ear a good part of the time while it was dis-

charging; but, after that discharge healed up, then there was no discharge, and then I was plumb perfectly deaf, and never have heard out of it since. I can't hear at all out of that ear now. I am about 49 years old. I never had anything the matter with that ear in my life before that fellow hit me; in fact, I never had anything the matter with me in my life only had that hand cut off. My hand was cut off at the time this trouble took place. It was cut off when I was a boy. There wasn't anything the matter with that ear at all up to the time of this blow. There hasn't been anything else happened to it since then that affected my ear that I know of. * * * I was lying down on the seat from the door with my face towards the door, this little partition door in this car, swinging door. My head was across the seats, north. We was going south, and my head was right across the aisle towards the aisle, and my feet was on the seat next to the door. When I woke up I shoved this man's foot off my neck. I told him: 'It does look like to me you men might find some other place to fight besides fighting over me.' At that time this man and the conductor had just been pulled apart. The conductor wasn't making any fight. This man was pounding at Mr. Blythe and Mr. Blythe had his back to me, and these fellows were behind Mr. Blythe. Blythe was pulling, trying to get away. He was trying to go back into the large compartment. When I grabbed hold of this man's leg, I looked up and noticed he had Mr. Blythe around the throat with both hands, and these fellows that were with him grabbed this other man. They grabbed the man who afterwards struck me. They tried to pull him off of Mr. Blythe, and did pull him off. Mr. Blythe never done or said a word, but just went on through that door into the larger compartment. He never said a thing to these fellows that I remember of. They didn't say a word to him. They turned their attention to me when I told them they could find some other place to fight. They hadn't said a thing to me up to that time. I said it looked like to me they could find some other place to fight without fighting over me. This man that afterwards struck me said: 'God damn you, maybe you don't like it.' I told him I didn't like it. Then he says 'Help yourself,' or something like that, and put his hand in his hip pocket; and I says: 'Young man, you are too close to me to pull a gun. I will knock you through that window.' I don't know what he said then. There was a right smart little quarrel between us. I can't remember every word. I says: 'You are too close to me to pull a gun.' We passed our compliments back and forth, and I presume each one of us knew the other one was talking. He didn't pull his gun. I told him that I would knock him through that window if he pulled a gun. They then went on out just on the front end of this coach platform, out

towards the engine, and left me in there. They returned again. I couldn't say exactly how long it was before they came back, but probably five minutes or something like that. They came back, and met Mr. Blythe in the same place. About five minutes after they left Mr. Blythe was coming into that little compartment and the other boys then came back, and it seems like they met there. There were then two or three licks passed between them. Blythe struck at him and he struck at Blythe. The other boys didn't take any hand in it. Then Mr. Blythe turned and walked to this little door, and stood there in the door a minute, and they commenced to abuse me, the fellow that struck him. He cursed me for everything you could think of. I says, 'There is three or four of you fellows, and there is no use for me to fight all of you, and I have to take what you say.' None of the rest of them had a word to say. I will say that lasted from a minute to five minutes. I don't know the exact time. Then they went on out and followed Mr. Blythe through this little door in the large compartment of the smoker, and in about five minutes Mr. Blythe came back into this little compartment or place where I was, and says: 'Stewart, if I was in your place, I would get out of here. You are liable to be done bodily harm by these fellows. Did you notice that fellow putting his hand in his pocket?' And I said, 'Yes.' There was nobody else in that compartment but me. When Mr. Blythe told me it was dangerous to stay in there, I asked him what all that trouble was about, and he went on and explained it, and then he went on out. I stayed in there then anywhere from a minute to five minutes. I didn't go out with him when he asked me to go, because I didn't know whether I wanted to go. It looked like I was running from those fellows. That is the way I figured it. I stayed there anywhere from a minute to five minutes, and then I got up, and thought to keep down trouble I would get out of there, and started back, and they struck me with the bottle. I didn't go when the conductor asked me to go into that other car. I don't know why I didn't go at once. I might have been delayed some way or another about fixing my grips or something like that, I can't remember. I went out very soon, though. I said a minute to five minutes, but it might have been less than a minute.

"It is not a fact that on a former trial of this case I testified that after Blythe went out I remained in there about 15 minutes, and then, thinking the train was nearing Stephenville, that I got up to get my grips, and started out through the other compartment. I don't remember giving that kind of testimony, and, if I did, I didn't understand the question. I don't know whether it is a fact or not that I testified on a former trial in that connection that I didn't leave that front end of that car and go out on account of any anticipated danger, but that I wasn't expecting anything when I was struck. I wasn't expecting anything when I was struck. I wasn't expecting to be assaulted in that way, but, after Mr. Blythe warned me and told me these fellows were going to get off at Stephenville, I says to Mr. Blythe, when he was telling me about this trouble: 'Why don't you stop your train, and put these rowdies off of here? There is not a man on this train but what would render you assistance.' I told him that before we got to Stephenville, after they had the second round, when he came in there to tell me I had better get off. That was the conversation, and he said those fellows got off at Stephenville. He said they would get off at Stephenville. I didn't tell the conductor to put him off, but I said it looked like he would do it. I said: 'Mr. Blythe, you ought to put these fellows off.' I don't remember whether I have ever mentioned that in my testimony before or not. I can't say whether it is a fact or not that I didn't mention that at the former trial of this case. I don't remember testifying on the former trial that I didn't anticipate any further trouble from this man at all, but probably I wasn't asked that question in that way. It seems to me like it was about 10 minutes after I was struck before the train stopped. That is when I was in that washroom. After I was struck, I went back in the chair car and put my suit case down, and then went in the washroom. I don't know how long after that it was before the train got to Stephenville, probably 20 minutes or something like that. I think it was about 30 minutes from the time I was struck, until they got off, but I might be mistaken about that. I don't remember how long it was after I was first awakened until I was struck. I don't know just where we were. It might have been 30 minutes after I was first awakened until I was struck. I can't say if it was 30 minutes after I was awakened before I was struck, and 30 minutes after I was struck before we got to Stephenville. It was an hour after the first altercation before we got to Stephenville, but I don't remember, it was all in the night, and there was a good deal of trouble and excitement there. I couldn't say who else was in that car where I was struck at the time I was struck. It was dark, but there were other passengers on the train. I noticed this man that had his arm cut in there. I can't remember how many people I saw in there where I was struck. I think I saw as many people as three in there, and probably a dozen. I didn't know anybody in there at all, and it was pretty near dark. I don't know where this man went after he struck me. I walked back through the coach after I washed by face and head, but I never did see him. That was before the train got to Stephenville. I didn't wash my face and head after the train left Stephenville. I met Mr. Blythe in the meantime, and I says: 'That fellow knocked me in the head with a bottle of beer.' And he says: 'No, sir; it

was a bottle of whisky. I saw him go out of the coach with the bottle neck in his hand.' That was all before we arrived at Stephenville. I hadn't passed this man who struck me when I was struck. I guess I was about opposite the seat in front of him. I didn't look at him as I passed by, but I looked at him as he raised up. I recognized him as the same man. I didn't say a word, and neither did he. I think he got up pretty quick is my recollection about it. I wasn't expecting anything like that, and really wasn't paying any attention to it, and just got a glance at the fellow. I wasn't expecting to be attacked in that way. I don't know whether I was expecting to be attacked or not after Mr. Blythe told me what he did. I don't know why I didn't get up right away and accept his invitation and follow him right out. I could have gotten up right away and followed him. I don't know whether Mr. Blythe was in sight when I was struck or not. I didn't see him. I didn't see him about there anywhere. When I came back out of the front end of that car into the larger car, as well as I remember, this man who struck me was sitting about four seats from this little partition door, three or four seats. He was sitting on the right hand side of the aisle coming this way, and·on my left-hand side as I went that way. As well as I remember, he was sitting about three or four seats from the door, facing the front of the car, facing the engine. I didn't see him as I went in the door. The first ˙I noticed of him was the time that he struck me. I was about opposite the end of the seat in front of him when he struck me, in the aisle between the two seats and about opposite the end of the seat in front of him. I was not exactly in front of him, but kinder to the side of him. It seems to me like when he got up he was facing next to the aisle and I think he just raised up and struck me. When I went in the coach, I pushed this door open with my cripple arm, and pulled my suit case through behind me, and started down the aisle; and he was sitting on about the fourth seat. When I got just about opposite the ends of the two seats in front of him, he struck me with the bottle. He struck me just above the ear there on the left side. He broke the skin. It never cut any gash, but it cut a hole through both doubles of my hat. Just a little blood oozed through the skin, and my hair was bloody and the skin was bloody, just bruised it, I reckon you would call it. That raised such a big knot on my head there that I couldn't get my hat on. The man that I said had his arm cut was back between me and the door that I came in from. He was behind me at the time I was struck. When I was struck, I said I was dazed, my hat was knocked off, and, as soon as I recovered myself, I picked up my hat and suit case and went in the other car. The blow didn't knock me down, but it addled me. I don't know what position he was in after he struck me, but, when I knew anything, I was on my feet, and I reached down to pick up my hat, and this fellow was sitting there, wiping the blood off his arm. I turned around to reach for my hat. I never did see the fellow that struck me at all after I was struck. I went back through the car after I had washed my face, but I didn't see him at all after he struck me. I think if he had been there I would have seen him. Mr. Blythe told me he met him coming out of the car with a bottle neck in his hand, and that· is all I know."

[1, 2] The conductor gave a different version of the matter, and denied that he suggested to the plaintiff to go back in the chair car, or that he apprehended that the plaintiff was in danger. The plaintiff's testimony indicates, and the conductor's testimony shows, that the latter was not present, and knew nothing of the assault complained of until after it was committed. The jury had the right to accept the plaintiff's version of the affair, and therefore we have reached the conclusion that this court ought not to set aside the verdict, and that it should be permitted to stand, upon the theory that the plaintiff's testimony warranted a finding by the jury, and therefore we so find ourselves that appellant's conductor was guilty of negligence on the occasion in question, because he failed to expel from the train the passenger who committed the assault upon the plaintiff before the assault was committed, and that the negligence referred to was a proximate cause of the plaintiff's injury. This case is distinguishable from Putman v. Railway Co., 55 N. Y. 108, 14 Am. Rep. 190, a leading case relied on by appellant. In that case the passenger who was assaulted, in company with two ladies, took passage upon the defendant's car. One F., who was intoxicated, subsequently got onto the front platform of the car, and, after riding there a short distance, opened the car door, and insulted and annoyed the ladies. P., the passenger assaulted, asked the conductor to make him be quiet. The conductor directed him to sit down and be quiet. He sat down near P., and, after the conductor returned to the rear platform, addressed to P. abusive and threatening language in a low tone, but not audible to the conductor. After remaining a short time he returned to the front platform, where he remained quietly until P. left the car, when he jumped therefrom with a car hook, and, as P. was assisting his companions to alight, F., struck him with the hook, causing his death. In an action to recover damages by the legal representatives of P., it was held that there was no evidence of neglect of duty on the part of the conductor, or want of proper care and vigilance on the part of the servants of the defendants, and that the action could not be maintained. In that case the appellant court held that while the conductor could have rightfully removed the offensive passenger from

the car at the time he insulted and intimidated the females under the protection of the deceased, when he failed to do so at that time, and pursued the course suggested by the deceased and quieted the offending passenger, it was not his duty thereafter to remove him, unless his previous conduct showed that he was a dangerous or improper person to remain; and we make the following excerpts from the opinion in that case: "But a railroad company has the power of refusing to receive as a passenger, or to expel, any one who is drunk, disorderly, or riotous, or who so demeans himself as to endanger the safety or interfere with the reasonable comfort and convenience of the other passengers, and may exert all necessary power and means to eject from the cars any one so imperiling the safety, or annoying others, and this police power the conductor or other servant of the company in charge of the car or train is bound to exercise with all the means he can command whenever occasion requires. If this duty is neglected without good cause, and a passenger receives injury, which might have been reasonably anticipated or naturally expected, from one who is improperly received, or permitted to continue as a passenger, the carrier is responsible. * * * After Foster came into the car, and insulted and intimidated the females under the protection of the deceased, the latter appealed to the conductor, not to exclude Foster from the car, but to make him be quiet, and the conductor directed him to sit down and be quiet, and he did thereupon take a seat on the opposite side of the car from the females and near the deceased, and after remaining there a short time left the car, and took his place on the front platform, the front door of the car being closed, and during the residue of the passage to Forty-Sixth street gave no occasion of complaint so far as appears. He was during that time peaceable and inoffensive. During this latter part of the ride there was no occasion for removing him from the car, unless the occasion and a necessity for such removal was furnished by his previous conduct, showing that he was a dangerous or improper person to remain. He had ceased to address or in any way insult or annoy the females, upon being requested by the conductor to sit down and be quiet; and his ready compliance with that request and his taking his place soon thereafter on the platform, and proceeding quietly and peaceably on his journey, was some evidence that there was no reason to apprehend a renewal of his insults in that direction, and justified the conductor in at least giving him the benefit of a further probation. This was precisely in accord with the suggestion of the deceased; neither he nor the conductor apprehending any serious harm or injury, certainly not a wanton and murderous attack upon any one with a dangerous weapon.

It is true that on taking his seat he did not observe the strictest rules of propriety, and by putting his feet on the seat violated good taste and good manners; but it was not an offense of which the passengers could very seriously complain, or which essentially violated their rights, so long as there was abundant room for all, and there was no indecency in the position. This breach of good manners certainly did not tend to show that he was a dangerous man, and was condoned by his subsequent withdrawal from the seat, and the body of the car entirely. It is also in evidence that, while seated near the deceased, he directed abusive language to him, and made threats indicating an intent to do him some bodily harm before he left the car. But all this was in an undertone, and, so far as appears, was unheard by the conductor, occupying his proper place on the rear platform, and neither the deceased nor any one else called the attention of the conductor to it. It was probably treated with indifference by the deceased and all who heard it, and regarded as the maudlin and senseless gabble of a drunken man, unworthy of notice, and incapable of creating any apprehension of danger or harm. But, be this as it may, there is no evidence to justify an inference that the conductor did hear or could have heard or known of the abuse or threat, so that to him they were not evidence that he was an unsafe and dangerous man, or that there was any reason to apprehend injury to the other passengers from him or his acts."

The decision in that case was rested upon the proposition that after the conductor quieted the disorderly passenger, who readily submitted to the conductor's request, the latter, not being apprised of his subsequent misconduct in threatening to inflict injury upon P., had the right to assume that he was not an unsafe and dangerous man, and had no right to apprehend that he would inflict injury upon any other passenger. In the case at bar, according to the plaintiff's testimony, within five minutes after the obnoxious passenger had ceased to curse and abuse him in the presence of the conductor, the latter returned to the plaintiff and suggested that he was in danger of bodily injury from the party referred to. That fact tends to show that the conductor, not only realized the plaintiff's danger at the time the offending passenger cursed and abused him, but that his apprehension of such danger has not ceased, and existed at the time the injury was inflicted. It may be that the conductor apprehended that, if the plaintiff remained alone where he was, he would be assaulted, and did not believe that the assault would be committed while he was passing through the other compartment of the car. But, in order to fix liability, it is not necessary that the conductor should foresee that injury would be inflicted at the

particular place and in the particular manner in which it was inflicted. According to the plaintiff's testimony, the conductor knew that a drunken and disorderly passenger was on the train, knew that he had cursed and abused plaintiff, and made a threatening gesture, indicating that he might use a deadly weapon, and at the time the assault was made he apprehended that the plaintiff was still in danger at the hands of the passenger referred to. Under these circumstances we think the jury was warranted in concluding that it was the duty of the conductor to stop the train and remove the offensive passenger, if it could be done with the aid of such assistance as was available, and the failure to pursue that course was negligence.

[3, 4] Appellant interposed the defense of contributory negligence, alleging that the plaintiff was guilty of such negligence because he failed to go with the conductor into the chair car when he was requested so to do. The trial court gave a charge that was very favorable to appellant, except that it did not submit any question of contributory negligence. It may be that that court was of the opinion that, as the plaintiff had paid for the seat he was occupying, he could not be charged with negligence in refusing to give up that seat and go into another car in order to avoid an injury which appellant could have prevented by removing from the train the source of threatened injury. Be that as it may, and if it be conceded that the evidence presented the question of contributory negligence, we do not think the court erred in refusing to give the instruction that was requested, which reads as follows: "If you believe from the evidence in this case that the defendant's conductor, Blythe, came to the plaintiff in the compartment of the car where he was riding a short time before plaintiff was assaulted, as testified to by him, and told plaintiff that he was in danger of having bodily injury inflicted upon him, and asked plaintiff to go back into another car, and you further believe from the evidence that a person of ordinary prudence, situated as plaintiff then was, and under the circumstances surrounding him, would have gone with said conductor back into another car, and if you further believe that such act on the part of said conductor was a sufficient precaution to be taken by said conductor, and if you further believe from the evidence that if he had obeyed such request, if any, made by such conductor, that the injury inflicted upon him would not have happened, and if you further believe from the evidence that the circumstances did not require at such time that said conductor take other steps for plaintiff's protection, then you are instructed to find a verdict for the defendant." It will be noted that this instruction,

if it had been given, would have required the jury, in order to find a verdict for the defendant, to find, first, that the plaintiff was guilty of contributory negligence; and, second, that the defendant was not guilty of any negligence. In the court's charge the jury was clearly and distinctly instructed to find a verdict for the defendant if the latter was not guilty of negligence. That charge was more favorable to appellant than the requested instruction. The one given required a verdict for the defendant if the proof failed to show that its conductor had been guilty of negligence on the occasion in question. The one requested did not authorize the jury to find a verdict for the defendant upon a finding that the plaintiff was guilty of negligence, but required an additional finding that the defendant was not guilty of negligence. The requested charge required a finding of two separate and distinct facts, in order to justify a verdict for the defendant, while the court's charge required a finding of only one of those facts to justify such a verdict, and was therefore more favorable to the defendant.

We deem it unnecessary to decide whether or not the doctrine of contributory negligence arises in the case. That doctrine embraces the proposition that, although the defendant be guilty of negligence contributing to the injury, still the plaintiff should not recover because he was also guilty of negligence which likewise contributed to the injury. The requested charge did not embrace any such proposition. It presented the proposition that if the defendant was not guilty of negligence, and the plaintiff's injury was caused by his own negligence, he was not entitled to recover, and required the jury to find both of those facts in order to find for the defendant. As a matter of fact, if the defendant was not guilty of negligence on the occasion in question, the plaintiff was not entitled to recover, regardless of any question of negligence on his part, and the court, in effect, so instructed the jury. Hence we hold that no error was committed in refusing to give the requested instruction.

All the other questions presented in appellant's brief have been considered, and are decided against it.

No reversible error having been pointed out, the judgment is affirmed.

Affirmed.