Ida Siegelbaum, Respondent, v. Victor J. Dowling and Thomas E. Murray, Jr., as Receivers of the Interborough Rapid Transit Company, Appellants.

First Department, June 10, 1938.

*James Hess* of counsel [*James L. Quackenbush*, attorney], for the appellants.

*Samuel L. Sargent* of counsel [*Wexler & Sternberg*, attorneys], for the respondent.

Glennon, J. The plaintiff instituted this action against the defendants upon the theory that they had failed to protect her from injury and assault by a fellow passenger while she was upon the platform of one of defendants' subway stations. After trial a comparatively small verdict, viewed in the light of the injuries sustained, was found in her favor.

The appellants deny any responsibility and assert, in effect, that the injuries which plaintiff suffered resulted from her own carelessness, and the actions of her friend, over whom they had no control.

The testimony given by the plaintiff indicated that at the time she was injured she was thirty-eight years of age and prior thereto she had obtained a divorce from her husband.

Shortly before five P. M. on September 26, 1933, she entered the defendants' subway station at Thirty-third street and Seventh avenue. While boarding a north-bound train she met one Hyman Furman, a widower. She had known him since she was a child. During the course of the trip Furman inquired as to the health of her mother and said that he had to give up his business because he could not concentrate on it any more.

At One Hundred and Forty-ninth street plaintiff and Furman got off the train and walked up the stairway to the Jerome avenue platform, which is on a different level. While on the steps, she testified, " He [Furman] wanted me to give him an answer whether I would marry him or not, and he got a hold of my arm and he threatened to kill me.  *  *  *  He said if I wouldn't marry him, he would kill me." She said she did not think that he would carry out his threat; nevertheless, she told a special officer who was standing on the platform. The latter, " Just grinned. He sort of took it as a joke."

Furman and the plaintiff walked back and forth on the platform. She said that he became very loud in his demands that she should promise to marry him. She was about to board a Jerome avenue train when Furman took hold of her arm and would not permit her to do so. After the train had left the station, plaintiff testified that Furman said, " If I wouldn't give him an answer, he is going to throw me under the train, and then another time he said if I wouldn't give him an answer he is going to shoot me."

The plaintiff again spoke to the special officer. " I told the special officer that the man is threatening to kill me, that he shall please see that he separates us; either I should get on the train or let him get on the train, that I was very anxious to get home. All he said, ' Well I guess you folks must have had a couple of drinks too much. You will be better to-morrow.' And I walked, and then I walked away, because after all, I felt very, very embarrassed. There were quite a few people there.  *  *  *  I walked away and as I was walking, I told Mr. Furman — I stopped walking at that moment — and I told Mr. Furman that I will not give him a definite answer that day, that perhaps in the near future I might change my

mind toward him, when suddenly he got hold of my waist and my arm and he started to grapple with me. We struggled. I couldn't resist him for about a few seconds, and then all I felt I was going into space. That is all I remember."

As a result of the force exercised upon her by Furman, plaintiff was thrown to the tracks in the path of a north-bound train. Furman jumped in front of the train but, strange to state, escaped almost unhurt. Plaintiff suffered severe injuries; and later it became necessary to amputate her left leg immediately below the knee. Furman was arrested and placed in the prison ward at Fordham Hospital. Shortly thereafter he was released on bail. Before he was arraigned in court he committed suicide.

The testimony of the plaintiff indicates that Furman's wife died about a year and a half prior to the assault. Soon thereafter he began calling upon plaintiff and occasionally presented her with candy. About five or six months prior to the occasion when plaintiff was injured, Furman asked her to marry him. It is not clear from her testimony that she had declined. When interviewed by an assistant district attorney, about ten days after the event, she said," Well, we just let it drift. There was no decision." Further she stated, " It is just an accident. I don't want to press any charges against him."

Daniel Gillespie, the special officer, testified, in substance, that there were about twenty-five people upon the station platform. He saw the plaintiff and Furman standing near the edge of the platform talking in a quiet tone of voice. He denied that plaintiff spoke to him. In fact, he said, he could not hear what they were saying. He described the happening as follows: " Well, the train was about — well, the car length away, or it might be less than that, when all of a sudden I seen him grab ahold of her — over they went. There was no sound, no noise, no one hollered, or anything else." Almost immediately thereafter, the special officer notified the station agent of the accident and the power was shut off.

The motorman of the train testified that on coming into the station about twenty people were scattered around the platform and that he noticed nothing unusual until he was ten feet away, " when the man made two steps forward with his arms around her, went off in front of me. I was right on top of them."

One Lincoln Johnson, a passenger on the train, was standing next to the motorman's cab. He described what he saw as follows: " Well, as we came in I was looking at the side door, looking at the people. The train started to slow down a little bit about 30 or 40 feet in front. I saw this couple. There was some people

in between, but I got a pretty good glimpse of them. I was attracted by some slight movement of his arm. He seemed to be talking to her, and as we got a little closer I looked over and I saw him coming with his arms, see, either bunked into her or put his arms around her and lifted her off and then dove in after her."

A passenger on a train is entitled to have a railroad company, through its employees, exercise the utmost vigilance for his safety and protection since, ordinarily, he is not in a position to safeguard himself. If a railroad company allows a passenger, with knowledge on the part of its employees, to suffer injury at the hands of a disorderly fellow passenger without even an attempt to prevent it, then liability attaches.

In *Putnam* v. *Broadway & Seventh Ave. R. R. Co.* (55 N. Y. 108) Judge ALLEN said: " But a railroad company has the power of refusing to receive as a passenger, or to expel any one who is drunk, disorderly or riotous, or who so demeans himself as to endanger the safety or interfere with the reasonable comfort and convenience of the other passengers, and may exert all necessary power and means to eject from the cars any one so imperiling the safety, or annoying others; and this police power the conductor, or other servant of the company in charge of the car or train, is bound to exercise with all the means he can command whenever occasion requires. If this duty is neglected without good cause, and a passenger receives injury, which might have been reasonably anticipated or naturally expected, from one who is improperly received, or permitted to continue as a passenger, the carrier is responsible."

Here the plaintiff, while still a passenger, was waiting upon the platform of the Jerome avenue division of the line for the purpose of taking another train. Let us assume that her story is true, and of that we entertain a grave doubt. She had the means at hand to protect herself from the injury which she sustained. She did not believe that Furman intended to carry out any threats against her life when she first spoke to the special officer who, " just grinned." Later, after she had walked up and down the platform with her suitor, she asserts that she believed Furman might carry out his threats to throw her in front of the train or to shoot her. Again she claims that she spoke to the special officer who apparently passed it off as a joke. There is nothing in the record which might indicate that the officer heard Furman make any threats. In fact there is no evidence that any other passenger heard the so-called threats. Under the circumstances a reasonably prudent man might readily believe that there was no foundation for her accusation and particularly would that be so if, as the

testimony indicates in this case, the plaintiff stood close to the edge of the platform while a train was approaching. If the officer was negligent in failing to perform his duty, the plaintiff was likewise guilty of contributory negligence in standing in a position of danger with full knowledge of the fact that Furman had threatened to throw her under an approaching train.

The reasoning employed by Chief Judge RUGER, in *Palmer* v. *Pennsylvania Co.* (111 N. Y. 488) in concluding his opinion in that case, applies with equal force here. He said in part: " A problem not free from doubt is presented by a verdict, adjudging the defendant guilty of negligence in not observing the danger arising from the presence of snow and ice upon a platform, and yet exonerating the plaintiff from the imputation of contributory negligence in view of the fact that he knew that ice and snow had accumulated on the platform; that he had twice slipped there the same night, and thereafter walked fearlessly over it without availing himself of the protection of hand rails within his reach on both sides of the platform. The same duty which rested upon the defendant to see and remove this obstruction rested upon the plaintiff, with still greater force, to guard himself from injury while passing over it, because he had been informed by experience of its presence and danger."

Had plaintiff really believed that her friend intended to carry out his threats, she could have stepped back on the platform to a position of safety. This she did not do.

For the reasons assigned the judgment should be reversed, with costs, and the complaint dismissed, with costs.

MARTIN, P. J., UNTERMYER and COHN, JJ., concur; CALLAHAN, J., dissents from so much of the decision as dismisses the complaint and votes for reversal of the judgment and a new trial on the ground that the verdict is against the weight of the credible evidence.

Judgment reversed, with costs, and complaint dismissed, with costs.