FRANCES GOODWIN et al., Plaintiffs, *v.* CITY OF NEW YORK, Defendant.

City Court of the City of New York, Trial Term, Bronx County, October 20, 1954.

*Irving Braff* for plaintiffs.

*Adrian P. Burke, Corporation Counsel (Samuel Zelensky* of counsel), for defendant.

QUINN, J. It was New Year's Eve, December 31, 1952, at about 11:30 P.M., when the plaintiff, Frances Goodwin, a young, unmarried lady, twenty years of age, accompanied by a male escort, boarded a southbound train of the defendant at the 181st Street station on the west side, I. R. T. division of the New York City transit system.

This ten-car train of the defendant was manned by a crew of two: a motorman and a conductor.

The duties of the conductor in the normal operation of the train were carried out from his post between the first and second cars. In the course of training for his employment he had been expressly instructed by the defendant that under no circumstances was he to lay a hand upon disorderly passengers; but in the event of any turbulence aboard a train under his charge, he was merely to send word, at the earliest opportunity, to the trainmaster (presumably, an official of the defendant on duty in some centralized post, located at an undisclosed point in the extensive web of the defendant's rapid transit system).

On this waning New Year's Eve, a night which the court judicially notices is traditionally, in the city of New York, one of widespread high spirits, public revelry and even roistering,

a single patrolman of the New York City transit police was assigned to keeping peace and order on all the trains and stations of the defendant's west side, I. R. T. division between 96th Street and 242nd Street.

While this train was in transit between the 191st Street and 181st Street stations, a passenger came forward to the conductor and gave him to understand that three youths were carrying on in a boisterous and violent manner in the rearward cars of the train, to the annoyance, inconvenience and alarm of well-disposed, peaceable passengers.

The conductor started back through the train, but before reaching the disorderly trio, or talking to them, he abandoned whatever purpose he may have had in mind and returned to his usual post.

When the train stopped at the 181st Street station, the conductor, from the position of vantage occupied by him in surveying and controlling the simultaneous opening and closing of the doors, saw the three rowdies leave the train and start up the station stairs. But just before the doors closed he saw them leap back on the train. They immediately resumed their rampage through the cars, shouting, cursing, breaking electric light bulbs and insolently disputing with and insulting passengers who sought to remonstrate with them. While the train was proceeding between the 181st Street and 168th Street stations the conductor went to the motorman and asked him to notify the trainmaster of the disorder on the train. The motorman stopped the train three hundred feet north of the 168th Street station at a telephone in the subway tunnel from which, it is to be inferred, he called the trainmaster and told him of the three maliciously mischievous boys they had on board.

When the train stopped at the 168th Street station the three larrikins got off but loitered on the station platform still exhibiting their bent to hooliganism. As the train doors closed one of them ripped a telephone directory from its fastenings at a telephone booth on the station and flung it at the train as it started to move. This bulky book shattered the window before which the plaintiff, Frances Goodwin, was seated, struck her in the head and sent fragments of broken glass flying into the car, several of which hit the plaintiff and cut her about the face.

The plaintiff, Frances Goodwin, was taken from the train at the next station, 157th Street, to the Presbyterian Hospital at Medical Center where she received first-aid treatment for her cuts and bruises, as well as her shock and near-hysteria. Thence she went to her own physician who took five sutures in

the largest of her lacerations and attended her generally there-
after. At the trial a fine linear scar, running from beneath her
right eye, some two inches, to her nose, was still visible, as was
a much slighter scar on the bridge of her nose.

" It is settled that a common carrier has a legal duty, after
due notice, to protect its passengers from the assaults of fellow
passengers." (*Green Bus Lines* v. *Ocean Acc. & Guar. Corp.*,
287 N. Y. 309, 312.) The liability of the carrier is predicated
on its failure properly to exercise the police power with which
it is invested for the protection of well-disposed and peaceable
passengers. (*Putnam* v. *Broadway & Seventh Ave. R. R. Co.*,
55 N. Y. 108, 113.)

The defendant, as a common carrier, had authority to expel
the three ruffians who were so demeaning themselves as to
endanger the safety and interfere with the reasonable comfort
and convenience of other passengers. This police power the
defendant, through its conductor, or other employee in charge
of keeping order on its facilities, was bound to exercise vigi-
lantly and promptly, with all the means at its command. This
duty the defendant, through the studied reluctance, or insuffi-
ciency of its employees or its dilatory system of procedures,
neglected. It made no immediate, decisive attempt to quell the
disturbance, of which it had ample notice; nor by a prompt, firm
show of authority to chasten the disturbers, or discourage them
from the willful course of unflagging, reckless misconduct on
which they were plainly embarked. As a direct consequence
of the defendant's neglect of the duty it owed its passengers,
the plaintiff, Frances Goodwin, as might reasonably have been
anticipated, was injured. For this, the defendant is liable in
damages. (*Giblett* v. *Garrison*, 196 App. Div. 953, affd. 232
N. Y. 618; *Thomson* v. *Manhattan Ry. Co.*, 75 Hun 548; *Putnam*
v. *Broadway & Seventh Ave. R. R. Co.*, *supra*; cf. *Duner* v.
*Hudson & Manhattan R. R. Co.*, 264 App. Div. 229; see, also,
*Gillespie* v. *Brooklyn Heights R. R. Co.*, 178 N. Y. 347; 2 Hutchin-
son on Carriers [3d ed.], § 1094, p. 1278; Richardson on Bail-
ments, Carriers and Innkeepers [6th ed.], § 221, p. 144, and
Warren on Negligence, § 11, subds. [d]–[f], pp. 190–192.)

While the facial scars which the plaintiff, Frances Goodwin,
will bear for the rest of her natural life, may not materially
mar her comeliness, and indeed may be unnoticeable under cover
of the make-up now universally employed by females, from an
early age, in beautifying the skin they love to retouch; never-
theless she will have to face them daily, however privately, in the
mirror of her morning and nightly toilette and undergo some

twinge of discomfort and distress in beholding a cosmetic flaw of neither her own nor nature's making: an ineradicable memento of the defendant's apathetic neglect of its duty to protect her from a sustained outbreak of hoodlumism on one of its trains, that never-to-be-forgotten, disastrous New Year's Eve.

Findings of fact and conclusions of law having been waived, the plaintiff, Frances Goodwin, for the pain, suffering, disability, distress, humiliation and embarrassment she has endured and, in some respects, will continue to endure, is awarded the sum of $2,000.

The plaintiff, Abraham Goodwin, for medical expenses incurred in his daughter's behalf and the loss of her services during her minority, is awarded the sum of $200.

Ten days' stay and thirty days to make a case.