95 N.Y.2d 95 (2000)
733 N.E.2d 184
711 N.Y.S.2d 112
EDWARD G. LAUER, Respondent,
v.
CITY OF NEW YORK et al., Appellants.
Court of Appeals of the State of New York.
Argued April 5, 2000.
Decided May 16, 2000.
*97 Michael D. Hess, Corporation Counsel of New York City (Julian L. Kalkstein and Larry A. Sonnenshein of counsel), for appellants.
Leahey & Johnson, P. C., New York City (Peter James Johnson, Jr., Peter James Johnson, James Patrick Tenney and Christopher Delamere Clarke of counsel), for respondent.
Judges LEVINE, CIPARICK, WESLEY and ROSENBLATT concur with Chief Judge KAYE; Judges BELLACOSA and SMITH dissent and vote to affirm in separate opinions in which each concurs.

OPINION OF THE COURT
Chief Judge KAYE.
On this appeal we revisit a familiar subject: whether a member of the public can recover damages against a municipality for its employee's negligence. Here we answer that question in the negative.

The Facts
Three-year-old Andrew Lauer died on August 7, 1993. That same day, Dr. Eddy Lilavois, a New York City Medical Examiner, performed an autopsy and prepared a report stating that the child's death was a homicide caused by "blunt injuries" *98 to the neck and brain. Although the report indicated that the brain was being preserved for further examination, the following day a death certificate was issued stating that Andrew's death was a homicide. Based on the Medical Examiner's conclusion, the police began investigating what they thought was a homicide, focusing primarily on plaintiff, Andrew's father. Weeks later, on August 31, 1993, the Medical Examiner and a neuropathologist conducted a more detailed study of Andrew's brain. The report, prepared in October 1993, indicated that a ruptured brain aneurysm caused the child's death, thus contradicting the earlier conclusion. The Medical Examiner, however, failed to correct the autopsy report or death certificate, and failed to notify law enforcement authorities.
Meanwhile, the Police Department's investigation into Andrew's death continued. Some 17 months later, in March 1995, after a newspaper exposé, the autopsy findings were revised, the police investigation ceased and an amended death certificate was prepared. As a result of this incident, the City Medical Examiner who had conducted the examination resigned. Plaintiff and his estranged wife subsequently commenced separate actions. Lisa Lauer's action against the City of New York and Dr. Lilavois, seeking damages for intentional and negligent infliction of emotional distress, was dismissed. In affirming the dismissal, the Appellate Division held that her allegations failed to establish "that she fell within any recognized orbit of duty upon which liability may be based" (see, Lauer v City of New York, 240 AD2d 543, 544, lv denied 91 NY2d 807).
In the present action seeking $10 million in damages against the City of New York, the Office of the Chief Medical Examiner, Dr. Lilavois and the Police Department, plaintiff alleges defamation, violation of his civil rights, and both negligent and intentional infliction of emotional distress. He claims that defendants' conductincluding the Medical Examiner's negligent performance of the autopsy, failure to correct the erroneous report and death certificate, and failure to disclose that Andrew's death was not a homicide"precipitated the destruction of [his] marriage * * * forced him to sell his home and leave his neighborhood, and caused him to become the object of public scorn, humiliation, ridicule, embarrassment, harassment and contempt throughout the City of New York." He further alleges that he "sustained severe and debilitating emotional distress, emotional anguish, anxiety and mental suffering."
*99 On defendants' motion, Supreme Court dismissed the defamation and civil rights causes of action, but allowed plaintiff to pursue his emotional distress claims. A divided Appellate Division modified Supreme Court's order (see, 258 AD2d 92). All of the Justices agreed that the defamation and civil rights claims were properly dismissed. They also unanimously concluded that plaintiff's intentional infliction of emotional distress claim warranted dismissal; that any causes of action based on performance of the initial autopsy were immunized as a governmental exercise of discretion; and that the Medical Examiner's failure to correct the reports and accurately inform the authorities were "ministerial" acts. The Appellate Division divided, however, as to whether plaintiff could maintain a claim for negligent infliction of emotional distress based on those ministerial acts, a majority concluding that he could. Viability of that single remaining claim is the issue now before us on this appeal.

The Law as Applied to the Facts
Analysis begins with several undisputed propositions. Municipalities long ago surrendered common-law tort immunity for the negligence of their employees. A distinction is drawn, however, between "discretionary" and "ministerial" governmental acts. A public employee's discretionary actsmeaning conduct involving the exercise of reasoned judgmentmay not result in the municipality's liability even when the conduct is negligent. By contrast, ministerial actsmeaning conduct requiring adherence to a governing rule, with a compulsory resultmay subject the municipal employer to liability for negligence (see, Tango v Tulevech, 61 NY2d 34, 40-41). No one disputes that the Medical Examiner's misconduct here in failing to correct the record and deliver it to the authorities was ministerial.
There agreement ends. Plaintiff contends that the City should be liable for the Medical Examiner's "ministerial negligence," while defendant urges that the complaint be dismissed.
We do not agree with plaintiff that a ministerial breach by a governmental employee necessarily gives rise to municipal liability. Rather, a ministerial wrong "merely removes the issue of governmental immunity from a given case" (supra, 258 AD2d, at 111 [Sullivan, J. P., dissenting in part]). Ministerial negligence may not be immunized, but it is not necessarily tortious (see, Tango v Tulevech, supra, 61 NY2d, at 40 [recovery *100 available only if ministerial action "is otherwise tortious and not justifiable pursuant to statutory command" (emphasis added)]; see also, Robertson, Municipal Tort Liability: Special Duty Issues of Police, Fire, and Safety, 44 Syracuse L Rev 943, 945 ["waiver-of-immunity statutes have not created new causes of action where none existed before; they have only removed the shield of governmental immunity where a cause of action would exist if the tort-feasor were a private person"]). There must still be a basis to hold the municipality liable for negligence (see, Florence v Goldberg, 44 NY2d 189, 195 ["Absent the existence and breach of * * * a duty, the abrogation of governmental immunity, in itself, affords little aid to a plaintiff seeking to cast a municipality in damages"]; see also, De Long v County of Erie, 60 NY2d 296 [liability for ministerial failure to process "911" call rested on County employee's affirmative assurances of assistance made to victim]; 18 McQuillin, Municipal Corporations § 53.04.25, at 165 [3d rev ed]).
This brings us directly to an essential element of any negligence case: duty. Without a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm (see, Pulka v Edelman, 40 NY2d 781, 785, rearg denied 41 NY2d 901; see also Prosser and Keeton, Torts § 53, at 357 [5th ed]; 3 Harper, James and Gray, Torts § 18.1, at 650 [2d ed]). While the Legislature can create a duty by statute, in most cases duty is defined by the courts, as a matter of policy.
Fixing the orbit of duty may be a difficult task. Despite often sympathetic facts in a particular case before them, courts must be mindful of the precedential, and consequential, future effects of their rulings, and "limit the legal consequences of wrongs to a controllable degree" (Tobin v Grossman, 24 NY2d 609, 619; Strauss v Belle Realty Co., 65 NY2d 399, 402). Time and again we have required "that the equation be balanced; that the damaged plaintiff be able to point the finger of responsibility at a defendant owing, not a general duty to society, but a specific duty to him" (Johnson v Jamaica Hosp., 62 NY2d 523, 527; see also, Palsgraf v Long Is. R. R. Co., 248 NY 339, 341, rearg denied 249 NY 511).
This is especially so where an individual seeks recovery out of the public purse. To sustain liability against a municipality, the duty breached must be more than that owed the public generally (see, Florence v Goldberg, supra, 44 NY2d, at 195; Smullen v City of New York, 28 NY2d 66, 70; see also, 18 McQuillin, Municipal Corporations § 53.04.25, at 165, supra). *101 Indeed, we have consistently refused to impose liability for a municipality in performing a public function absent "a duty to use due care for the benefit of particular persons or classes of persons" (Motyka v City of Amsterdam, 15 NY2d 134, 139). Here, because plaintiff cannot point to a duty owed to him by the Office of the Chief Medical Examiner, his negligence claim must fail.
Pointing to New York City Charter § 557, plaintiff argues that the Office of the Chief Medical Examiner owed him a duty to communicate accurate information to authorities pertaining to his son's death. Section 557 charges the Chief Medical Examiner with examining "bodies of persons dying from criminal violence" or other suspicious circumstances, keeping "full and complete records in such form as may be provided by law," and promptly delivering "to the appropriate district attorney copies of all records relating to every death as to which there is, in the judgment of the medical examiner in charge, any indication of criminality."
Violation of a statute resulting in injury gives rise to a tort action only if the intent of the statute is to protect an individual against an invasion of a property or personal interest (Steitz v City of Beacon, 295 NY 51, 56; see also, O'Connor v City of New York, 58 NY2d 184, 189-190; Motyka v City of Amsterdam, supra, 15 NY2d, at 139).
In Steitz v City of Beacon (supra, 295 NY 51), for example, plaintiff sought to recover damages suffered as a result of a fire, relying on a City Charter provision requiring maintenance of a fire department. We concluded that liability could not be predicated on the Charter provision, which was not designed to protect the personal interest of any individual, but rather was "designed to secure the benefits of well ordered municipal government enjoyed by all as members of the community" (id., at 55). We explained that:
"An intention to impose upon the city the crushing burden of such an obligation should not be imputed to the Legislature in the absence of language clearly designed to have that effect.
* * *
"Such [City Charter] enactments do not import intention to protect the interests of any individual except as they secure to all members of the community *102 the enjoyment of rights and privileges to which they are entitled only as members of the public. Neglect in the performance of such requirements creates no civil liability to individuals" (id., at 55-56).
New York City Charter § 557 similarly defines one of the municipality's governmental functions. It establishes the Office of the Chief Medical Examiner as part of the City's Department of Health, and requires performance of autopsies and preparation of reports for the benefit of the public at large. Significantly, the only individual to whom the Medical Examiner must by statute report is "the appropriate district attorney" (see, New York City Charter § 557 [g]). Neither plaintiff, nor other members of the general public who may become criminal suspects upon the death of a person, are persons "for whose especial benefit the statute was enacted" (see, Motyka v City of Amsterdam, supra, 15 NY2d, at 139). Permitting recovery here would rewrite section 557, radically enlarging both the responsibility of the Office of the Chief Medical Examiner and the potential liability of the City.
Nor do we find any duty to plaintiff derived from a "special relationship" with him. A "special relationship" requires:
"(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking" (Cuffy v City of New York, 69 NY2d 255, 260).
The "direct contact" and "reliance" requirements are particularly important, as they rationally define and limit the class of persons to whom the municipality's "special duty" extends (id., at 261).
Those requirements are not met here. The Medical Examiner never undertook to act on plaintiff's behalf. He made no promises or assurances to plaintiff, and assumed no affirmative duty upon which plaintiff might have justifiably relied. Plaintiff alleges no personal contact with the Medical Examiner, and therefore also fails to satisfy the "direct contact" requirement of the test. There is, moreover, no indication that the Medical *103 Examiner knew that plaintiff, or anyone else, had become a suspect in the case. Nor do Medical Examiners generally owe a "special duty" to potential homicide suspects. Their function in this context is not as a law enforcement agency but solely to impart objective information to the appropriate authorities for the benefit of the public at large (see, People v Washington, 86 NY2d 189, 192-193).
As we explained in De Angelis v Lutheran Med. Ctr. (58 NY2d 1053, 1055):
"A line must be drawn between the competing policy considerations of providing a remedy to everyone who is injured and of extending exposure to tort liability almost without limit. It is always tempting, especially when symmetry and sympathy would so seem to be best served, to impose new duties, and, concomitantly, liabilities, regardless of the economic and social burden. But, absent legislative intervention, the fixing of the `orbit' of duty, as here, in the end is the responsibility of the courts."
Here, in order for plaintiff's claim for negligent infliction of emotional distress to be successful, we would have to impose a new duty on the Office of the Chief Medical Examiner, which for the future would run to members of the public who may become subjects of a criminal investigation into a death. This we refuse to do.[1]

The Dissents
Fixing the orbit of duty has likely divided this Court more than any other issue. The present case is no exception, as evidenced by two dissenting opinions. Were the issue solely one of "humanistic intuition" or "moral duty," the result might well be otherwise. Our responsibility, however, is to set the particular case before us into its carefully developed precedential *104 framework, mindful always of the opportunities the common law allows for refinements to assure that the rule or principle that emerges is a sound one.
Here we cannot agree with our dissenting colleagues that a duty to plaintiff is found under existing law. The Smith dissent, urging that the "special relationship" test has been satisfied, assumes "extensive contact" between plaintiff and the Medical Examiner that is not borne out by the record.[2] Nor can we agree with the dissenting Judges' proposed new duty, based on negligent initiation of a course of events with foreseeable harm. This is simply not a prudent expansion of the law.
Neither Wagner, nor Moch, nor Croslandthe dissenters' case law pivotssupports such a duty. In Wagner v International Ry. Co. (232 NY 176, 180), danger did indeed invite rescue, but significantly there was a recognized duty owed by defendant railroad directly to its passenger, who was the subject of the rescue; there was no comparable relationship between plaintiff and the Medical Examiner. In Moch Co. v Rensselaer Water Co. (247 NY 160, 168), the Court acknowledged that launching "a force or instrument of harm" might constitute legally cognizable negligence. Any liability for such conduct, however, nonetheless required a recognized duty on the part of the municipal defendant running to the plaintiff. Indeed, Moch exemplifies the principle we apply today: the Court there dismissed plaintiff's claim, concluding the action was "not maintainable as one for a common-law tort" because defendant waterworks companyhaving contracted to supply water to the Cityowed no duty directly to the plaintiff when the water supply failed and its warehouse was destroyed.
Finally, Crosland v New York City Tr. Auth. (68 NY2d 165, 169-170), addressing the standard of care owed by a publicly owned common carrier to its passengers, is also readily distinguishable. Relying on Public Authorities Law § 1212 (3), which authorizes private recovery against the Transit Authority for the negligence of its employees in the operation of the subway system, the Court in Crosland held that defendant could be liable for its employees' negligent failure to summon aid while *105 watching, from a position of safety, a passenger beaten to death. As we made clear in Kircher v City of Jamestown (74 NY2d 251, 254-255, n 1), the City's statutory responsibility was key to our holding in Crosland. There is no similar responsibility here.
Among the many concerns courts have in enlarging the ambit of dutyespecially in the area of municipal liabilityis concern for the consequential effects of their decision. The Bellacosa dissent insists that its proposed heightened duty is "inevitably narrowed" and "pinpointed," owing to a "relatively self-defined, small circle of potential suspects"indeed, "extend[ing] only to this plaintiff." We cannot agree that this is so. In our view, allowing emotional distress claims against a municipality for an official's negligent failure to transmit correct information to law enforcement authorities conducting criminal investigations in this case will have far-reaching effects in future cases. As is already evident, the argument for the next case quickly becomes "The duty of care that this Court recognized in [Lauer] places the duty that ought to be recognized in this case within the realm and contemplation of that precedent" (see, e.g., Bellacosa, J., dissenting opn, at 118).
In the end, plaintiff's claim is not supported by existing law, and we cannot agree that the proposed enlargement of the orbit of duty, resting largely on the foreseeability of harm, is a sound one.
Accordingly, the order of the Appellate Division should be reversed, without costs, the complaint dismissed and the certified question answered in the negative.
SMITH, J. (dissenting).
Because I believe that plaintiff Edward G. Lauer has adequately pleaded a prima facie case for negligent infliction of emotional distress, I dissent.
On August 6, 1993, plaintiff and his wife took their three-year-old son Andrew to the hospital because he was gasping for breath. After an examination, the hospital sent the child home. The next morning the child was dead. Defendant Eddy Lilavois, a medical examiner from the Office of the Chief Medical Examiner (OCME), conducted an autopsy and concluded that the child was murdered by "blunt injuries of [the] neck and brain."
An investigation by the District Attorney focused almost immediately on plaintiff. On August 31, 1993, however, approximately three weeks after the initial autopsy, Dr. Angeline R. Mastri and Dr. Lilavois examined Andrew's brain and *106 concluded that he died of natural causes from an aneurysm due to dysplasia of a branch of the left posterior cerebral artery. On that day, Drs. Lilavois and Mastri prepared a neuropathology report reflecting the accurate cause of Andrew's death. The report was filed with the OCME on October 14, 1993. Neither the New York City Police Department nor the District Attorney's office was apprised of the OCME's new findings regarding the true cause of Andrew's death. The Lauers were also not informed.
Police investigators allegedly attended Andrew's funeral, informing plaintiff's friends and family that plaintiff had "twisted his son's neck" and had "killed his son." Many of plaintiff's friends and family became openly hostile towards him, and his wife sued him for divorce. In addition, plaintiff was forced to sell his home because he was ostracized by his neighbors.
In March 1995, approximately 17 months after the OCME discovered the true cause of death, the New York Daily News began an inquiry into the status of the police investigation. The newspaper learned from the OCME that "coroners had long ago reclassified Andrew's death as natural." It was only upon the Daily News' exposé that the authorities learned that Andrew's death was no longer considered a homicide. The OCME subsequently amended the autopsy report and prepared an amended death certificate.
Plaintiff commenced this action against the City of New York, the OCME, Dr. Lilavois, and the NYPD (collectively, defendants), sounding in intentional and negligent infliction of emotional distress, defamation and civil rights violations. Supreme Court granted defendants' motion to dismiss the complaint except for the causes of action alleging intentional infliction of emotional distress and negligent infliction of emotional distress. On defendants' appeal and plaintiff's cross appeal, the Appellate Division determined that only the cause of action for negligent infliction of emotional distress was viable.

A.
On this appeal, defendants contend that by failing to provide the District Attorney with an amended autopsy report, Dr. Lilavois and the OCME breached a governmental duty owed to the public at large, not a duty owed directly to plaintiff, and thus they are protected by governmental immunity. Plaintiff counters that Dr. Lilavois' omission was a breach of a ministerial function, for which governmental immunity does not exist. *107 In my view, plaintiff has adequately alleged the breach of a ministerial duty for which defendants may be held liable in damages.
Although municipalities in this State have long surrendered their common-law tort immunity for the misfeasance of their employees, limitations exist regarding the scope of municipal tort liability. Generally, governmental immunity will attach when the official act of a municipal employee "involves the exercise of discretion or expert judgment in policy matters" and a municipal defendant will not be liable in damages for injuries sustained, even if resulting from negligence or malice (Haddock v City of New York, 75 NY2d 478, 484). If the action is exclusively ministerial, however, the municipality "will be liable if [the action] is otherwise tortious and not justifiable pursuant to statutory command" (Tango v Tulevech, 61 NY2d 34, 40).
Although distinguishing between an act of discretion and a ministerial function may sometimes be difficult, this Court has articulated a basic rule which serves as a guidepost in helping courts make the distinction. "[D]iscretionary or quasi-judicial acts involve the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result" (id., at 41).

B.
Turning to the actions of Dr. Lilavois, a medical examiner's conclusions after an autopsy regarding an individual's cause of death involve the exercise of reasoned professional judgment and discretion. Thus, the doctor's initial erroneous conclusion that Andrew died from "[b]lunt injuries of the neck and brain" and his characterization of the child's death as a homicide would be cloaked with governmental immunity. In contrast, Dr. Lilavois' duty to notify prosecuting authorities of an error in the original autopsy diagnosis stems from a duty delineated by the New York City Charter § 557 (g), which states:
"The chief medical examiner shall keep full and complete records in such form as may be provided by law. The chief medical examiner shall promptly deliver to the appropriate district attorney copies of all records relating to every death as to which there is, in the judgment of the medical examiner in charge, any indication of criminality."
*108 Compliance with the requirements of section 557 required no exercise of reasoned judgment on the part of Dr. Lilavois and the Appellate Division properly deemed the omission a breach of a ministerial function.[1]
Defendants' contention that even if Dr. Lilavois failed to perform a ministerial function, he breached a duty only to the public at large and not to plaintiff individually should be rejected. Municipal immunity presupposes an exercise of discretion while performing a governmental function (Cuffy v City of New York, 69 NY2d 255). We have articulated that the policy rationale underlying governmental immunity "reflects a value judgment thatdespite injury to a member of the publicthe broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury" (Haddock v City of New York, 75 NY2d, supra, at 484; Mon v City of New York, 78 NY2d 309, 313). Where, however, a municipal employee fails to perform a ministerial task, liability should attach, so long as a common-law duty running from the municipality to the individual claiming injury is established.

C.
With regard to whether the OCME owed a duty to plaintiff to accurately report the status of Andrew's death, general principles of negligence law are instructive. Liability sounding in negligence must first be premised upon a finding of a legal duty owed by the defendant to the plaintiff (D'Amico v Christie, 71 NY2d 76, 87). The concept of legal duty merges logic, science and public policy to determine whether the plaintiff's interests are entitled to legal protection against a defendant's conduct (Turcotte v Fell, 68 NY2d 432, 437; De Angelis v Lutheran Med. Ctr., 58 NY2d 1053, 1055). While foreseeability of injury does not solely determine the existence of a duty, that rule must be balanced with the well-established principle that "[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation" (Palsgraf v Long Is. R. R. Co., 248 NY 339, 344). In other words, foreseeability of injury and duty are not two discrete concepts when considering liability *109 grounded in negligence. Thus, "`whenever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to the circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger'" (Havas v Victory Paper Stock Co., 49 NY2d 381, 386, quoting Heaven v Prender, 11 QBD 503, 509, Britt, MR [1883]).
Here, once Dr. Lilavois characterized Andrew's death as a homicide and shortly thereafter learned that Andrew died of natural causes, a duty arose to plaintiff, an individual targeted by the investigation, resulting from the erroneous report. Dr. Lilavois knew that characterizing Andrew's death as a homicide was the impetus for the police investigation. Moreover, he allegedly knew that plaintiff was suspected in the homicide. Thus, the risk of failing to communicate the exculpatory evidence to the proper authorities, evidence which Dr. Lilavois and the OCME alone possessed, was reasonably perceivable. Dr. Lilavois knew or should have known that failing to exercise reasonable care under these circumstances would cause injury to plaintiff.
Although a court, exercising extreme caution, may impose a legal duty where none previously existed (Pulka v Edelman, 40 NY2d 781, 786), imposing a duty under these circumstances would not lead this Court into novel, uncharted waters of legal consequences. For example, liability in negligence may rest on a defendant's nondisclosure, which misleads a third party and results in injury or damage to a plaintiff predicated on the fact that "the misrepresentation or nondisclosure has led the person to whom it was made to forego action that might otherwise have been taken for the protection of the plaintiff" (Eiseman v State of New York, 70 NY2d 175, 187). This Court has stated that:
"Liability in such cases arises only where there is a duty * * * to give the correct information * * *. There must be knowledge, or its equivalent that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous he will because of it be injured in person or property. Finally, the relationship of the parties * * * must be such that * * * the one has the right to rely upon the other *110 for information, and the other giving the information owes a duty to give it with care" (International Prods. Co. v Erie R. R. Co., 244 NY 331, 338; see also, Eiseman v State of New York, supra, at 187-188).
Applying these principles to this case, defendants owed a duty to plaintiff upon which liability may be predicated. It is undisputed that Dr. Lilavois breached his duty to "promptly deliver to the appropriate district attorney copies of all records relating to" Andrew's death (NY City Charter § 557 [g]). Moreover, there can be no question that Dr. Lilavois knew (1) of the importance and seriousness of communicating correct information to the proper authorities regarding the actual cause of Andrew's death, (2) that the authorities were acting upon his initial assessment of the cause of death as a homicide, and that they relied upon the OCME to act with due care in deciphering Andrew's cause of death, and (3) that an error of this kind would lead to an unnecessary homicide investigation and possibly an erroneous arrest. Thus, the nature of the relationship between the OCME and the District Attorney was such that the District Attorney had the right to rely on the other for information regarding criminality in death. Once Dr. Lilavois and the OCME learned of the true cause of Andrew's death, they had a duty to act with reasonable care to inform the authorities, knowing that nondisclosure would result in further injury to plaintiff in this case.
In Eiseman v State of New York (70 NY2d 175, supra), this Court considered whether the State owed a legal duty to the estate of a decedent killed by an ex-felon admitted into a government-sponsored college program after a prison physician inaccurately completed a medical report indicating that the ex-felon had no history of mental instability. This Court declined to impose a duty on the State, concluding that the physician's duty to accurately report the ex-felon's medical history ran only to the college and not the entire college community. Moreover, questions existed regarding whether the physician had in fact withheld any information personally known to him and whether the physician was aware of or should have been aware that the information would be relied on by the decedent, or other students, as his representation of the ex-felon's medical history (id., at 189).
The facts of this case hardly mirror the circumstances in Eiseman. Dr. Lilavois knew that an investigation into Andrew's death was pending pursuant to his initial report and he allegedly *111 knew that plaintiff was a suspect. Thus, the possibility of danger to plaintiff here was so "apparent as to entitle him to be protected" (Palsgraf v Long Is. R. R. Co., 248 NY 339, 345, supra).
The imposition of a duty in this case is further supported by this Court's decision in Crosland v New York City Tr. Auth. (68 NY2d 165). In that case, the Court ruled that the New York City Transit Authority owed a duty to one of its passengers who was beaten to death by hoodlums as Transit Authority employees stood by and did nothing. In holding that "[w]atching someone being beaten from a vantage point offering both safety and the means to summon help without danger is within the narrow range of circumstances which could be found to be actionable" (supra, at 170), the Court rejected the Authority's governmental immunity-based argument.[2] Specifically, the Court stated that because the Authority's employee unreasonably failed to summon aid though he could have done so without risk to himself, such failure was beyond the boundary of immunity articulated in Weiner v Metropolitan Transp. Auth. (55 NY2d 175). Instead, balancing several policy considerations, the Court considered compensation for the victim and general deterrence, and concluded that the Authority had "failed to insure that its employees observe not only its own regulations, but also common standards of behavior" (Crosland v New York City Tr. Auth., supra, at 170).
Although the majority points out that the Transit Authority in Crosland was liable pursuant to Public Authorities Law § 1212 (3), that statute merely states that the Transit Authority "shall be liable for * * * the negligence of" a duly appointed employee. In holding the conduct of the Transit Authority actionable, the Court implicitly decided the legal question of duty, and determined that the Transit Authority owed a duty to the plaintiff.
Indeed, Crosland reflects the flexibility of this Court to balance considerations of social welfare and public interest against the boundaries of tort responsibility. The concept of duty is not static. As part of the common-law process, courts may indeed fashion the scope of duty "by balancing factors, including the *112 reasonable expectations of parties and society generally, the proliferation of claims * * * disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability" (Palka v Servicemaster Mgt. Servs. Corp., 83 NY2d 579, 586).
In this case, like the Transit Authority employee in Crosland, Dr. Lilavois' ministerial, mechanical task of notifying the authorities required nothing more than minimal efforts to avert a grave injustice. Plaintiff had a right to reasonably expect that the OCME perform its ministerial duties with reasonable care and in compliance with statutory mandates. Indeed society as a whole has the right to reasonably expect the same, particularly where, as here, misfeasance has such far-reaching implications. The imposition of liability here would not therefore contravene public policy. On the contrary, liability under these circumstances would affirm the reasonable expectations of both the parties and society. Moreover, it would emphasize to those who fail to use care that there are consequences for their actions.
Finally, by causing a criminal investigation, Dr. Lilavois initiated a chain of events that created a danger to plaintiff. Subsequently, upon realizing that he created an unreasonable danger to plaintiff, a targeted suspect of the investigation, Dr. Lilavois had a duty to exercise reasonable care to prevent the harm (Moch Co. v Rensselaer Water Co., 247 NY 160, 167; Restatement [Second] of Torts § 321; see also, id., illustration 2).

D.
This Court has stated that, absent a special relationship, "a municipality does not owe a duty to its citizens in the performance of governmental functions, and thus courts will not examine the `reasonableness' of the municipality's actions" (Sorichetti v City of New York, 65 NY2d 461, 468). There can be no serious dispute here that Dr. Lilavois' negligent act was ministerial in nature. Thus, plaintiff need not show the existence of a special relationship to establish defendants' liability (see, Boland v State of New York, 218 AD2d 235). Nevertheless, the facts demonstrate that a special relationship between defendants and plaintiff existed.
In Cuffy v City of New York (69 NY2d 255, 260), this Court delineated the four elements of a special relationship, which are: "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's *113 agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking."
These four factors are sufficiently alleged in this case. The OCME assumed control of Andrew's remains and undertook an affirmative duty, through its actions, to correctly determine the cause of death. Once labeling the death a homicide, Dr. Lilavois and the OCME knew that such characterization would prompt a police investigation. Setting an investigation into motion, the doctor and the OCME knew or should have known that any failure to come forth with exculpatory information could unnecessarily prolong the police investigation, causing harm to the limited number of individuals suspected of the crime. Significantly, Dr. Lilavois and the OCME exclusively possessed the exculpatory evidence.
The "direct contact" element, "which is closely related to the element of reliance, serves to rationally limit the class of persons to whom the municipality's duty of protection runs and exists" (Kircher v City of Jamestown, 74 NY2d 251, 257). While direct contact is necessary, this Court has not been overly rigid in its application, taking the particularities of each case into consideration (Cuffy v City of New York, 69 NY2d, supra, at 261-262). For example, in Sorichetti v City of New York (65 NY2d 461, supra), this Court permitted contact between the mother of an injured infant and the police to substitute for contact directly between the police and the infant (compare, Kircher v City of Jamestown, supra [direct contact not satisfied where two strangers to plaintiff notified police of plaintiff's danger]).
Here, plaintiff alleges that he had extensive contact with the OCME. While the extent of the contact is not clear from the record, this appeal is before us through a motion to dismiss. Given the procedural posture, plaintiff has been foreclosed up to this point from conducting discovery. Presumably, an agent from the OCME came to retrieve Andrew's body from plaintiff's home. However, what the record does establish is that Andrew's body came into direct contact with the OCME and that plaintiff is Andrew's next of kin. Under the circumstances of this case, Andrew's body, in which plaintiff maintained a cognizable property interest (see generally, Darcy v Presbyterian Hosp., 202 NY 259), is another link between plaintiff and the OCME, and sufficiently distinguishes plaintiff from the public at large (see, Kircher v City of Jamestown, supra, at 257-258).
*114 Finally, the key element of justifiable reliance is adequately alleged. Indeed, plaintiff had no choice but to rely on the OCME for an accurate assessment of Andrew's cause of death. Furthermore, plaintiff relied on the OCME to correctly report to the authorities any information in this regard. Even if defendant's initial conclusion regarding the nature of Andrew's death is shielded from liability, at a minimum, plaintiff had the right to rely upon the OCME to competently perform its statutorily mandated duties.
The conclusion that a special relationship exists does not mean that plaintiff may automatically recover. It remains a question for the trier of fact as to whether plaintiff has established the claims raised in the complaint.

E.
One to whom a duty of care is owed may recover for injuries sustained as a result of negligently caused psychological trauma so long as consequential physical manifestations of trauma exist (Johnson v State of New York, 37 NY2d 378, 381). Requiring physical manifestations, rather than emotional symptoms alone, is thought to provide an index of reliability (id.). This Court has recognized several exceptions to the rule requiring physical symptoms, however. One may recover for the emotional harm resulting from (1) the negligent transmission by a telegraph company of a message announcing death (id., at 382), (2) the negligent misinformation to a next of kin regarding the death of a relative (id.; see also, Rotondo v Reeves, 153 Misc 2d 769 [father could maintain action to recover damages for emotional distress from coroner's mistaken identification of family's pet rabbit's remains as those of the child and the consequent delay in discovering the true remains]), (3) the negligent mishandling of a corpse (Darcy v Presbyterian Hosp., 202 NY 259, supra), and (4) the denial of access to control the body of a deceased relative (Lando v State of New York, 39 NY2d 803, 805). In those cases, this Court has recognized that there exists "`an especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious'" (Johnson v State of New York, 37 NY2d, supra, at 382).
The unique circumstances of this case present a sufficient guarantee of genuineness and seriousness to sustain a cause of action for negligent infliction of emotional distress. The record establishes that for 17 months plaintiff was erroneously suspected of the murder of his only son. Plaintiff's emotional *115 injuries were allegedly the proximate result of Dr. Lilavois' failure to inform authorities that Andrew's death was caused by natural circumstances rather than homicide, as initially suspected. Believing that plaintiff was a murderer, his wife divorced him. His family, friends and neighbors shunned him. For close to two years, plaintiff needlessly lived under a cloud of suspicion, allegedly enduring depression and loss of weight caused by the nightmare he lived.
Under the circumstances presented, plaintiff should be given the opportunity to prove his allegations (see, Prosser, Torts § 54, at 330 [4th ed]; see also, Bovsun v Sanperi, 61 NY2d 219, 231; Battalla v State of New York, 10 NY2d 237, 240-242).
For the foregoing reasons, I dissent.
BELLACOSA, J. (also dissenting).
I agree with Judge Smith's lead dissenting opinion, and add this expression to augment my vote for affirmance of the Appellate Division order.
This State's tort jurisprudence recognizes that "[d]anger invites rescue" (Wagner v International Ry. Co., 232 NY 176, 180). That renowned case offers apt pari materia reasoning, and much more in the way of classic Cardozean guidance that is transcendent (id., at 180-182 ["The law does not ignore these reactions of the mind in tracing conduct to its consequences" and in determining that the "quality" of a defendant's acts relating to duty are appropriately questions of fact for a jury in circumstances such as are presented there and here]).
When an official initiates a course of events that creates a particular danger, then affirmatively maintains the Sword of Damocles over and directly onto the head of a particular individual, a common-law duty to that endangered and harmed person ought to be recognized. This Court would do well to make the policy choice open to it in this case, by acknowledging this legal duty. The effect here would merely allow an opportunity, as in Wagner, for a jury to redress the Job-like ruination of plaintiff's life.
The ruling I propose is especially warranted when the public servant, who precipitated the investigation of plaintiff as the suspect in the wrongfully certified homicide of his three-year-old son, fails to remove or at least mitigate the risk and harm that enveloped the life of that one knowable person. Time, circumstance, and place make the Medical Examiner's matter-of-course intervention a reasonable and feasible obligation. The care would, in balanced and controllable theory, extend only to this plaintiff. Indeed, the theoretical, foreseeable class would *116 be a relatively self-defined, small circle of potential suspects, in any event (compare the widened duty perimeter in Wagner, supra, and cases discussed infra). Moreover, a mathematical process of elimination naturally reduces the operational reach of this rule, and would not result in some open-ended potential drain on the public purse.
Next, the juridical norm I proffer is particularly appropriatearguably, at an a fortiori levelwhen the culpable employee unilaterally possesses the exclusive knowledge and singular power to right the wrong. He should be legally accountable for failing to act reasonably at the time when complete innocence became medically known and certain to him. It should not be overlooked that the public at large was never potentially a suspect in the infant's death; as it turned out and from the outset, only plaintiff was a beleaguered suspect from the moment the mistaken notice of a "homicide" by "blunt injuries to the neck and brain" was reported by the Medical Examiner to the District Attorney of Queens County. Death actually occurred from a natural causea ruptured aneurysm within the youngster's brain.
This duty theorem should be as much the legal canon, as it is the humanistic intuition and moral duty of anyone with such official control over another human beingindeed, someone in a unique and proximate position to "rescue" the very person he spliced onto the investigatory slide. This corollary to standard tort duty propositions involving the general governmental responsibility to the public evolves as an inevitably narrowed obligation, directed toward the unmistakably sole identifiable object of the Medical Examiner's series of actions and subsequent inactions (see, Restatement [Second] of Torts § 321; see also, id., comment a, illustration 2).
The general and the particular duties would thus complement one another, most justifiably (Moch Co. v Rensselaer Water Co., 247 NY 160, 167-168). Moch teaches: "If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward. * * * The query always is whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument for good" (id. [emphasis added, citations omitted]). Indeed, Moch also presciently warns against facile classifications or demarcations that contribute to calcifications in *117 the articulation and application of legal principles to real cases (Moch Co. v Rensselaer Water Co., supra; see also, Cardozo, Nature of the Judicial Process, at 19-23 [Yale Univ Press]). Legal principles should evolve with suppleness and flexible analysis (see, Palka v Servicemaster Mgt. Servs. Corp., 83 NY2d 579, 585 ["Common-law experience teaches that duty is not something derived or discerned from an algebraic formula"]).
To immunize the kind of alleged misconduct described by the pleading of this case would reward government agents who hide the truth and sweep wrongdoings under a rug of tort impunity. In such instances, truly responsible public employees have little to no incentive to own up to wrongdoings, since their official information is usually their secret (especially so in this case), and aggrieved parties will be barred from even entering a courthouse, no less reaching a trial airing of the truth.
The danger to the public purse and public tort policy is not sufficient or proportionate enough to block any chance of accountability and redress here. The zone of the proposed duty, as paradigmed through this case for future guidance, would be prudently limited by the exceptional quality and quantum of factors in this hard, and yes sympathetic, case. The sympathy feature, I must emphasize, does not drive my analysis; nor should it, on the other hand, disqualify the plaintiff and his case from common-law evolvement. The precedential template I propose is fully consistent with this Court's careful line drawing on the threshold duty question (see, e.g., Bovsun v Sanperi, 61 NY2d 219; see also especially, Crosland v New York City Tr. Auth., 68 NY2d 165, 170).
The key language of Crosland is particularly instructive, and not legally, realistically or semantically distinguishable, as the majority proposes. We said in Crosland: "Watching someone being beaten from a vantage point [subway token booth] offering both safety and the means to summon help without danger is within the narrow range of circumstances which could be found to be actionable (cf. Putnam v Broadway & Seventh Ave. R. R. Co., 55 NY 108, 116; Scalise v City of New York, 3 NY2d 951)" (Crosland v New York City Tr. Auth., supra, at 170). The allegations of plaintiff's complaint and the accompanying affidavits on this CPLR 3211 (a) (7) motion present enough to warrant further opportunity to proceed in the case. The next stages might uncover the direct and associated dealings of all the parties through EBTs, official files and medical records. Plaintiff is, after all, entitled to every favorable inference at this first pleading stage. Therefore, the Medical Examiner *118 should not be deemed, unrealistically or simply, ignorant of what he had officially unleashed against this particular plaintiffthe prime and only suspect in a homicide that never was. That is too easy an "out" for the Medical Examiner who ought to be in an even higher duty position and relationship than the subway token booth clerk in Crosland. That lesser ranking employee was held to a duty to an ordinary subway passengera victim with whom he otherwise never had anything to do.
After the follow-up autopsy proving that no crime was committed, the Medical Examiner did not so much as phone or E-mail the District Attorney or the investigating detectives of the New York Police Department with a simple message, e.g., "I was wrong when I reported this as a homicide. The child died of natural causes. Please stop the investigation of this man." Instead, he did not even amend the death certificate for two years until a newspaper blew the whistle on this tragedy. The duty of care that this Court recognized in Crosland places the duty that ought to be recognized in this case within the realm and contemplation of that precedent. The compelling reason is that here the "safe observer" personally and officially initiated the criminal investigation of this plaintiff and had to know that it was ongoing. Yet, he like the subway clerk did not "summon help" from his lofty post, nor did he even lift a finger to stop the ongoing damage to plaintiff. Yet, he was the most proximate, immediate and only agent in a position to do so.
The issue in this case, after all, does not hinge on a general duty to the public or merely a ministerial one that is imposed on the Medical Examiner under the reporting statute (see, New York City Charter § 557 [g]). This case involves a heightened duty phase, triggered at the subsequent and next level of particularized obligation.
I am, therefore, persuaded that the fact-pattern parameters and the pinpointed legal rule that would emerge from this case would parallel and build incrementally on the tempered configurations of cases like Crosland and Wagner (supra) (see also and compare, Kircher v City of Jamestown, 74 NY2d 251, 262 [dissenting opn, Bellacosa, J.], Merced v City of New York, 75 NY2d 798, 800 [concurrence, Bellacosa, J.], with Mastroianni v County of Suffolk, 91 NY2d 198).
The principle and analysis that I endorse, along with Judge Smith, are what the law ought to proclaim as the standard measurement of human and governmental conduct to foster *119 responsible and accountable discharges of specific obligations to generally governed and yet directly affected citizens. That is one of the traditional purposes of tort law principles. Prudent and fair evolvement of the common law supports this tort law policy choice. That is the process and role this Court has long taken, generally toward the positive development of the law, and particularly as applied to cognizable supplicants for judicial redress, like this plaintiff (see, Cardozo, Nature of the Judicial Process, at 133-137 and 161-167 [Yale Univ Press]).
The step back from this opportunityby operation of the majority reversal in this case of the sound Appellate Division majority ruling belowseals an undeniable miscarriage of justice. It was, to be sure, set in motion by the series of alleged blunders by the New York City Medical Examiner in this case. Instead of "rescuing" Lauer with the newly discovered truth, the Medical Examiner, under the microscope of the most benign reading of the allegations, remained grossly indifferent to stemming the harm he had let loose.
Plaintiff has sought only a day in court that is now foreclosed, thus immunizing the government's alleged wrongdoing against a concededly innocent citizen.
Order reversed, etc.
NOTES
[1] This Court has been especially reluctant to broaden the concept of duty where, as here, the injury alleged is negligently inflicted emotional injury (see, e.g., Johnson v Jamaica Hosp., supra, 62 NY2d, at 530). The dissenting Judges would unduly expand the narrow, limited class of cases where we have permitted recovery for emotional injury based on the long-established, common-law duty to next of kin with respect to the death of close family members (see, Smith, J., dissenting opn, at 114, citing Johnson v State of New York, 37 NY2d 378, 381-382; Darcy v Presbyterian Hosp., 202 NY 259). Those cases, however, do not support the quite different duty urged here, which would make a municipality liable, for emotional injury, to an open-ended plaintiff class of potential suspects in criminal investigations.
[2] Sorichetti v City of New York (65 NY2d 461) is in no way analogous (see, Smith, J., dissenting opn, at 113). In Sorichetti, a special relationship between the City and infant plaintiff arose out of an order of protection, plus the City's knowledgethrough direct dealings with the familyof the specific danger to the child, plus the City's instructions to the mother on the day of the assault, plus her reasonable expectation that the police would protect them (id., at 469).
[1] While New York City Charter § 557 requires the Medical Examiner to report his autopsy findings to the District Attorney, it cannot be disputed that the autopsy report is available to the next of kin (see, e.g., County Law § 677 [3] [b]).
[2] The Court expressly rejected the plaintiff's argument that the Authority owed the plaintiff a special duty because no evidence of direct contact between Authority agents and decedent existed. Furthermore, the Court ruled that liability to the Authority could not be premised on the alleged breach of Transit Authority rule 85, which imposed a duty higher than the Authority actually owed to decedent.