Bellacosa, J.
(also dissenting). I agree with Judge Smith’s lead dissenting opinion, and add this expression to augment my vote for affirmance of the Appellate Division order.
This State’s tort jurisprudence recognizes that “[d] anger invites rescue” (Wagner v International Ry. Co., 232 NY 176, 180). That renowned case offers apt pari materia reasoning, and much more in the way of classic Cardozean guidance that is transcendent (id., at 180-182 [“The law does not ignore these reactions of the mind in tracing conduct to its consequences” and in determining that the “quality” of a defendant’s acts relating to duty are appropriately questions of fact for a jury in circumstances such as are presented there and here]).
When an official initiates a course of events that creates a particular danger, then affirmatively maintains the Sword of Damocles over and directly onto the head of a particular individual, a common-law duty to that endangered and harmed person ought to be recognized. This Court would do well to make the policy choice open to it in this case, by acknowledging this legal duty. The effect here would merely allow an opportunity, as in Wagner, for a jury to redress the Job-like ruination of plaintiff’s life.
The ruling I propose is especially warranted when the public servant, who precipitated the investigation of plaintiff as the suspect in the wrongfully certified homicide of his three-year-old son, fails to remove or at least mitigate the risk and harm that enveloped the life of that one knowable person. Time, circumstance, and place make the Medical Examiner’s matter-of-course intervention a reasonable and feasible obligation. The care would, in balanced and controllable theory, extend only to this plaintiff. Indeed, the theoretical, foreseeable class would *116 be a relatively self-defined, small circle of potential suspects, in any event (compare the widened duty perimeter in Wagner, supra, and cases discussed infra). Moreover, a mathematical process of elimination naturally reduces the operational reach of this rule, and would not result in some open-ended potential drain on the public purse.
Next, the juridical norm I proffer is particularly appropriate — arguably, at an a fortiori level — when the culpable employee unilaterally possesses the exclusive knowledge and singular power to right the wrong. He should be legally accountable for failing to act reasonably at the time when complete innocence became medically known and certain to him. It should not be overlooked that the public at large was never potentially a suspect in the infant’s death; as it turned out and from the outset, only plaintiff was a beleaguered suspect from the moment the mistaken notice of a “homicide” by “blunt injuries to the neck and brain” was reported by the Medical Examiner to the District Attorney of Queens County. Death actually occurred from a natural cause — a ruptured aneurysm within the youngster’s brain.
This duty theorem should be as much the legal canon, as it is the humanistic intuition and moral duty of anyone with such official control over another human being — indeed, someone in a unique and proximate position to “rescue” the very person he spliced onto the investigatory slide. This corollary to standard tort duty propositions involving the general governmental responsibility to the public evolves as an inevitably narrowed obligation, directed toward the unmistakably sole identifiable object of the Medical Examiner’s series of actions and subsequent inactions (see, Restatement [Second] of Torts § 321; see also, id., comment a, illustration 2).
The general and the particular duties would thus complement one another, most justifiably (Moch Co. v Rensselaer Water Co., 247 NY 160, 167-168). Moch teaches: “If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward. * * * The query always is whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument for good” (id. [emphasis added, citations omitted]). Indeed, Moch also presciently warns against facile classifications or demarcations that contribute to calcifications in *117 the articulation and application of legal principles to real cases (Moch Co. v Rensselaer Water Co., supra; see also, Cardozo, Nature of the Judicial Process, at 19-23 [Yale Univ Press]). Legal principles should evolve with suppleness and flexible analysis (see, Palka v Servicemaster Mgt. Servs. Corp., 83 NY2d 579, 585 [“Common-law experience teaches that duty is not something derived or discerned from an algebraic formula”]).
To immunize the kind of alleged misconduct described by the pleading of this case would reward government agents who hide the truth and sweep wrongdoings under a rug of tort impunity. In such instances, truly responsible public employees have little to no incentive to own up to wrongdoings, since their official information is usually their secret (especially so in this case), and aggrieved parties will be barred from even entering a courthouse, no less reaching a trial airing of the truth.
The danger to the public purse and public tort policy is not sufficient or proportionate enough to block any chance of accountability and redress here. The zone of the proposed duty, as paradigmed through this case for future guidance, would be prudently limited by the exceptional quality and quantum of factors in this hard, and yes sympathetic, case. The sympathy feature, I must emphasize, does not drive my analysis; nor should it, on the other hand, disqualify the plaintiff and his case from common-law evolvement. The precedential template I propose is fully consistent with this Court’s careful line drawing on the threshold duty question (see, e.g., Bovsun v Sanperi, 61 NY2d 219; see also especially, Crosland v New York City Tr. Auth., 68 NY2d 165, 170).
The key language of Crosland is particularly instructive, and not legally, realistically or semantically distinguishable, as the majority proposes. We said in Crosland: “Watching someone being beaten from a vantage point [subway token booth] offering both safety and the means to summon help without danger is within the narrow range of circumstances which could be found to be actionable (cf. Putnam v Broadway & Seventh Ave. R. R. Co., 55 NY 108, 116; Scalise v City of New York, 3 NY2d 951)” (Crosland v New York City Tr. Auth., supra, at 170). The allegations of plaintiffs complaint and the accompanying affidavits on this CPLR 3211 (a) (7) motion present enough to warrant further opportunity to proceed in the case. The next stages might uncover the direct and associated dealings of all the parties through EBTs, official files and medical records. Plaintiff is, after all, entitled to every favorable inference at this first pleading stage. Therefore, the Medical Examiner *118 should not be deemed, unrealistically or simply, ignorant of what he had officially unleashed against this particular plaintiff — the prime and only suspect in a homicide that never was. That is too easy an “out” for the Medical Examiner who ought to be in an even higher duty position and relationship than the subway token booth clerk in Crosland. That lesser ranking employee was held to a duty to an ordinary subway passenger — a victim with whom he otherwise never had anything to do.
After the follow-up autopsy proving that no crime was committed, the Medical Examiner did not so much as phone or E-mail the District Attorney or the investigating detectives of the New York Police Department with a simple message, e.g., “I was wrong when I reported this as a homicide. The child died of natural causes. Please stop the investigation of this man.” Instead, he did not even amend the death certificate for two years until a newspaper blew the whistle on this tragedy. The duty of care that this Court recognized in Crosland places the duty that ought to be recognized in this case within the realm and contemplation of that precedent. The compelling reason is that here the “safe observer” personally and officially initiated the criminal investigation of this plaintiff and had to know that it was ongoing. Yet, he like the subway clerk did not “summon help” from his lofty post, nor did he even lift a finger to stop the ongoing damage to plaintiff. Yet, he was the most proximate, immediate and only agent in a position to do so.
The issue in this case, after all, does not hinge on a general duty to the public or merely a ministerial one that is imposed on the Medical Examiner under the reporting statute (see, New York City Charter § 557 [g]). This case involves a heightened duty phase, triggered at the subsequent and next level of particularized obligation.
I am, therefore, persuaded that the fact-pattern parameters and the pinpointed legal rule that would emerge from this case would parallel and build incrementally on the tempered configurations of cases like Crosland and Wagner (supra) (see also and compare, Kircher v City of Jamestown, 74 NY2d 251, 262 [dissenting opn, Bellacosa, J.], Merced v City of New York, 75 NY2d 798, 800 [concurrence, Bellacosa, J.], with Mastroianni v County of Suffolk, 91 NY2d 198).
The principle and analysis that I endorse, along with Judge Smith, are what the law ought to proclaim as the standard measurement of human and governmental conduct to foster *119 responsible and accountable discharges of specific obligations to generally governed and yet directly affected citizens. That is one of the traditional purposes of tort law principles. Prudent and fair evolvement of the common law supports this tort law policy choice. That is the process and role this Court has long taken, generally toward the positive development of the law, and particularly as applied to cognizable supplicants for judicial redress, like this plaintiff (see, Cardozo, Nature of the Judicial Process, at 133-137 and 161-167 [Yale Univ Press]).
The step back from this opportunity — by operation of the majority reversal in this case of the sound Appellate Division majority ruling below — seals an undeniable miscarriage of justice. It was, to be sure, set in motion by the series of alleged blunders by the New York City Medical Examiner in this case. Instead of “rescuing” Lauer with the newly discovered truth, the Medical Examiner, under the microscope of the most benign reading of the allegations, remained grossly indifferent to stemming the harm he had let loose.
Plaintiff has sought only a day in court that is now foreclosed, thus immunizing the government’s alleged wrongdoing against a concededly innocent citizen.
Judges Levine, Ciparick, Wesley and Rosenblatt concur with Chief Judge Kaye; Judges Bellacosa and Smith dissent and vote to affirm in separate opinions in which each concurs.
Order reversed, etc.